IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
February 12, 2010 Session Heard at Murfreesboro[1]

## STATE OF TENNESSEE v. DARRELL FRANKLIN

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Shelby County
No. 07-01517      James C. Beasley, Jr., Judge**

---

**No. W2007-02772-SC-R11-CD - Filed April 29, 2010**

---

We granted this appeal to determine whether the admission into evidence of an automobile license tag number observed and written down by a bystander near the crime scene who did not appear at trial violated the defendant's right to confrontation under the federal and state constitutions. A few seconds after being robbed at her place of employment, the victim ran out of the business, told a bystander that she had been robbed, and asked the bystander to observe the tag number of the vehicle operated by the man who had just left the business. The bystander did so and then came inside the store to write the number down for the victim. The victim added other descriptive information about the robber to the same piece of paper and then turned it over to the police. The tag number was traced to a vehicle owned by the defendant, whom a jury ultimately convicted of one count of robbery. The Court of Criminal Appeals reversed the conviction, holding that the written tag number was "testimonial hearsay" within the meaning of Crawford v. Washington, 541 U.S. 36 (2004), and Davis v. Washington, 547 U.S. 813 (2006), and concluding that the statement's admission was plain error. Based on our objective review of the circumstances surrounding the statement, we conclude that the written tag number was "nontestimonial hearsay" that did not implicate the defendant's right of confrontation and was admissible as an excited utterance. We reverse the judgment of the Court of Criminal Appeals and reinstate defendant's conviction.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed; Case Remanded to the Trial Court**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., and GARY R. WADE, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

---

[1] Oral argument was heard in this case on February 12, 2010 in Murfreesboro, Rutherford County, Tennessee, as part of this Court's S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Matthew Bryant Haskell, Assistant Attorney General; John H. Bledsoe, Senior Counsel; William L. Gibbons, District Attorney General; and Pamela D. Fleming, Assistant District Attorney General, for the appellant, State of Tennessee.

Robert Jones, Shelby County Public Defender; Phyllis Aluko (on appeal) and Lawrence R. White (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellee, Darrell Franklin.

## OPINION

### Factual Background

The events giving rise to this case took place at the Yorkshire Cleaners located in a strip mall at the intersection of Poplar Avenue and Holmes Street in Memphis. At the time of the events in question, a restaurant was being constructed immediately to the west of the cleaners, and a Baptist Minor Medical Center was open for business immediately to the east.

On Saturday, July 29, 2006, Melissa Polson was the only employee working at the Yorkshire Cleaners. Sometime that morning between 10:00 A.M. and 12:00 P.M., Polson testified that she was serving a customer when she saw another man standing in line. Polson testified that the man waited for about three minutes while she went to the back of the store to retrieve the first customer's clothing. Once Polson finished with the first customer, she asked this man to state his last name.[2] She thought his answer sounded like "Phillips" but was not sure, so she asked the man to say his last name again. Instead of repeating his last name, the man told Polson, "Give me all your money or I'm going to blow your ass off."

Based on this threat Polson presumed that the man was armed and would shoot her if she did not give him the money in the store's cash register. Looking down, Polson complied and handed over the money out of the cash drawer. The man then asked Polson to lift up the drawer to see if larger bills were kept underneath. There were no such larger bills. The man then told Polson to back up, turn around, and count to ten. Polson testified that the event "seemed like a long time" but took less than fifteen minutes.

As Polson completed her count to ten, she heard the dinging sound that the store's front doorbell made whenever it was opened. Polson then looked at a television monitor displaying the image from the store's security cameras. This image showed the man "speed

---

[2] Every customer's order was identified by a phone number and by the first three letters of the customer's last name. Polson testified that it was easier to ask each customer for a last name.

-2-

walking" away from the store to the left.[3] Polson then walked to the front door, and, within "maybe a couple of seconds" after hearing the ding, she exited the front door facing the parking lot. Polson admitted that she "took a chance" by going out of the store so quickly after the man had left, especially given her belief that he was armed.

Polson testified that, when she exited the front door, the only person whom she saw was a contractor helping to build the restaurant next door. Polson could see a white minivan beginning to move, about twenty feet away in the direction that the man had walked after he exited the store. The white minivan was the only vehicle leaving the parking lot at that time. Polson could not see the white minivan's driver or tag number. Polson did not move closer to obtain the tag number because she did not want to leave the store unlocked with the money it still had and because she was feeling "a little shaky" after being robbed for the first time in her life.

Polson asked the contractor where the man went who had just walked out of her door. She told the contractor that she had been robbed and needed the tag number of the vehicle that the man had gotten into. Polson testified that, while standing only two to three feet away from the white minivan, the contractor leaned over and observed its tag number.[4] He then walked back to her. When the contractor came back to the store, Polson's hand was shaking too badly to write down the tag number herself. Therefore, the contractor wrote down the tag number for her. Later, Polson wrote details about the man's face, height, and size on the same sheet of paper with the tag number. Subsequently, she gave that paper to the police when they arrived at the scene.

That same morning, Rhonda Dugger and Stephanie Smith were working as receptionists at the front desk of the Baptist Minor Medical Center ("medical center") next door. Each testified that a man entered the medical center and asked their permission to use the lobby restroom. They simultaneously granted him permission. After using the restroom, the man then left the medical center. Several minutes after the man left the medical center, police arrived on the scene, and Dugger and Smith learned that the Yorkshire Cleaners next door had been robbed.

---

[3] Although the police provided a compact disc for copying the recording from the surveillance cameras, the owners refused to cooperate with the police in providing the video footage. Thus, it is not a part of the record.

[4] The record does not contain any maps or diagrams that illustrate the respective positions of Polson and the contractor or the location of the parked minivan and the route by which it exited the parking lot.

Sergeant John Williams, the first patrol officer on the scene, testified that Polson was "[v]ery upset and scared" when he arrived at 10:24 A.M. Based on the Yorkshire Cleaners' location within his assigned ward, Williams estimated that it would have taken him three to four minutes from the dispatch call to get to the scene. Williams testified that he spoke with Polson, who explained that a black male had entered the business and demanded that she empty the cash register. Polson described the man to Williams as six feet tall, heavy set, and dark complected. Williams also testified that Polson had provided a tag number for the white minivan leaving the business, and Williams included that tag number in his offense report.[5]

According to Polson, another officer[6] spoke with the contractor inside the Yorkshire Cleaners. Polson testified that she and the contractor both provided the officers on the scene with their driver's licenses so the police could contact them later. However, no officers who testified had interviewed the contractor or had any information about his identity. He was not called as a witness.

Officer Mondie Quinn was assigned as the case coordinator for the Yorkshire Cleaners robbery. Quinn testified that he began his investigation by reviewing the offense report that uniform patrol officers had prepared at the crime scene. He contacted Polson to verify some of the facts in the offense report. Specifically, Polson described the perpetrator as an African American male, approximately six feet tall, weighing 200-250 pounds, heavy set with chubby cheeks, and a light-to-medium complexion.

Next, Quinn ran tag number 523 FTD, which was listed in the offense report narrative, through a police vehicle registration database. The tag number was registered to Darrell Franklin ("Defendant"). During Quinn's testimony the State introduced the vehicle registration form for this tag number into evidence as a public document, and Quinn read the tag number for the record.

Quinn then prepared a photo spread, with Defendant's headshot placed in the number five position. On the afternoon of July 31, Quinn, accompanied by Detective Paul Neely, visited Polson at the Yorkshire Cleaners. Quinn presented Polson with the form entitled "Advice to Witness Viewing Photographic Display" ("advice form"). This form explained, among other things, that the persons depicted might or might not have been involved in the crime, the viewer should not assume that the guilty party is represented in the lineup, and the

_____

[5] Contrary to Polson's own testimony that she did not personally see the man who robbed the business inside the white minivan, Williams testified that Polson told him at the crime scene that she had observed the same man leave the parking lot in the minivan.

[6] This officer is not identified by name in the record.

-4-

viewer should make an identification only if the viewer is "positive." Polson went over the advice form, "made sure [she] understood what it was saying," and then signed the form.

After Polson signed the advice form, Quinn laid the photo lineup down on the store counter for Polson to review. Quinn "didn't want to pressure" Polson, so he "walked off" while she reviewed the lineup. Polson testified that she looked at the lineup for "five to ten minutes because [she] did not want to just pick someone [she] recognized off of the street" and because she "just wanted to make sure the person [she chose] was the right one." She circled the headshot placed in the number five position and wrote in the space underneath, "This is the guy that robbed me. He said give me your money or I'll blow your ass off." She signed and dated the form. At trial, Polson conceded that, although she had described the suspect as clean shaven, she picked the photograph of an individual with facial hair. Polson explained that "the beard in the photo was so short you could see the shape of [his] face. It's not going to change."

While Quinn was at the strip mall, he and Neely walked next door to the medical center and spoke with Dugger and Smith. Both Dugger and Smith independently reviewed and signed an advice form. Then, they separately reviewed a photo lineup.[7] Quinn testified that the advice form and photo lineup were identical to the ones that he had given to Polson. Dugger circled the headshot in the number five position and wrote underneath, "This is [the] guy that came in our facility to use the restroom 7/29/06." She signed and dated the form. At trial Dugger testified that the person who used the restroom looked the same as in the headshot, and, when specifically asked about whether the person had facial hair, she testified, "That's what I picked." She testified that the person was wearing a baseball cap on the day he asked to use the restroom.

Smith also circled the headshot in the number five position on her copy of the photo lineup and wrote underneath, "This is the guy that came in to use [the] bathroom on the day of [the] robbery." She signed and dated the form. At trial Smith testified that she was "positive" about her identification "at that time" when she reviewed the lineup. While testifying at trial, Smith said that she could not then identify Defendant as the person who used the restroom. However, she testified that her memory would have been better when she made the identification on July 31. She could not recall if the person who asked to use the restroom was wearing a hat.

---

[7] Dugger testified that she and Smith were each paired with a different officer when they individually reviewed the photo lineup. Dugger did not discuss the lineup with Smith before making an identification, nor could Dugger see what Smith was doing when Smith made her identification.

Although Quinn found construction workers on site at the strip mall, Quinn testified that he could not locate the contractor who wrote down the minivan's tag number. The patrol officers did not give Quinn a name and address from a driver's license, or any other information that would identify the contractor.

Having obtained three positive identifications of Defendant, Quinn directed the Criminal Apprehension Team to obtain a warrant and arrest him. After Defendant was brought into custody, Quinn interviewed Defendant on August 21, 2006. Defendant signed a waiver of rights before the interview began.

When Quinn informed Defendant of the robbery allegations, Defendant first claimed that he had been home all of July 29 with his "wife,"[8] Tenniale Shaw. Quinn attempted to phone Shaw but was unsuccessful. Quinn then informed Defendant of the description and tag number of the minivan observed at the scene of the robbery. Defendant responded that he had been at the family apartment with Shaw's wheelchair-bound uncle, while Shaw had the minivan throughout the day. Quinn testified that he spoke with Shaw over the telephone that evening, and Shaw said that, on July 29, she had gone shopping with her children for school clothes.[9] Quinn spoke again with Defendant the following day, but that conversation only lasted for about five minutes since Defendant did not change his account of events.

Shaw testified for the defense at trial. On July 29, Defendant had left their apartment around 2:00 A.M. to go to a casino. Shaw was watching television when Defendant returned at 5:15 A.M. and went to bed. Shaw further testified that the family owned one car at the time—a white 1998 Plymouth Voyager minivan. At 7:30 A.M., according to their typical practice on Saturday mornings, Shaw and the three children took the minivan to a park along Alcy Road in South Memphis to participate in a church function. When Shaw left the apartment, she saw that Defendant was still in the bed. Shaw and her children remained at the park until 11:00 A.M., when they went to the house of Shaw's grandmother in the Orange Mound neighborhood. At some point during the day, Shaw, her children, and her

---

[8] At trial, Defendant explained that he was not legally married to Shaw, despite referring to her as his wife. Although Defendant was no longer living with Shaw, he had previously been with her for seventeen years and fathered three children by her. At the time of trial, Shaw was living with someone else but was discussing reconciliation with Defendant.

[9] Quinn conceded that he did not record his conversation with Shaw in his written case notes, which indicated only that he had tried and failed to reach Shaw by telephone. Shaw, who used the phone at her sister's residence nearby as a contact number, testified that she never spoke with Quinn about the case. Her sister said that Quinn had called, but Shaw claimed that Quinn never answered when Shaw tried to call him back.

grandmother shopped at a Wal-Mart. Nothing in the record indicates that the Wal-Mart was located in the vicinity of where the robbery took place, nor did Shaw testify that she otherwise drove the minivan into the parking lot of that strip mall on July 29.

Leading up to the trial in September 2007, Shaw had called the police once in July and again in August because of domestic disturbances with Defendant. In her trial testimony, Shaw stated that she was not afraid of Defendant, he had not threatened her about testifying, and he had not committed violence to compel her testimony. When asked to explain her calls to the police, Shaw testified that she had called in August "to get [Defendant] some help for his anger," and previously called in July because she "was trying to keep from getting in trouble."

Defendant also testified on his own behalf, answering "no" when asked repeatedly whether he had robbed the Yorkshire Cleaners on July 29. He further testified that, between the hours of 8:00 and 11:00 A.M. on that day, he was home asleep in bed. He testified that he had driven the white Plymouth minivan, which was registered in his name, to the Grand Casino at 2:00 A.M. He returned at 5:15 A.M. and went to sleep. Although he testified that his wife and children "normally" went to the park on Saturday morning, he did not remember their leaving on July 29 because he was asleep at the time.

Defendant testified that he could remember his whereabouts on July 29 because his birthday was the next day. When asked why he initially told Quinn that he was with his wife and kids when the robbery occurred, Defendant testified that he "probably was confused" and was "nervous, real nervous" while being questioned by the police. When asked on cross-examination, "So it didn't matter when the robbery was committed, what day, what hour, your standard excuse would have been I was at home with my wife and kids?," Defendant answered, "Right."[10]

The jury convicted Defendant of a single count of robbery, a class C felony. See Tenn. Code Ann. § 39-13-401 (2006). Classified as a Range III persistent offender, Defendant was sentenced to twelve years in the Department of Corrections.

---

[10] The State also asked Defendant what Quinn told him about the robbery during the interview after Defendant's arrest. During his response Defendant volunteered that his record only included an offense for driving while a habitual motor vehicle offender, an "old dope charge," and "a few misdemeanors." The trial court then held a jury-out hearing and ruled the State could ask about Defendant's nine prior felony convictions that the State had listed in a Notice of Enhancement and Impeachment served on defense counsel before trial. See Tenn. R. Evid. 609(a)(3). When cross-examination resumed, Defendant testified that he had four convictions for driving while a habitual motor vehicle offender, four convictions for drug offenses, and one conviction for larceny.

## Procedural Background

On the day of trial and before the court empaneled the jury, defense counsel orally moved to suppress the contractor's written statement of the tag number from the white minivan leaving the strip mall parking lot immediately after the robbery. Defense counsel argued that the tag number, if offered into evidence, would be inadmissible hearsay because the contractor was not going to testify. In denying the motion and allowing the State to introduce the tag number into evidence, the trial court explained:

> If [Defendant's] tag and his van w[ere] present at the scene . . . that's just a piece of circumstantial evidence . . . . And if [Polson]'s there witnessing the van, directing the witness to write [the tag number] down and then takes it because she's too scared to write or too nervous to write it down, . . . she's subject to being cross-examined and the weight that the jury wants to give the accuracy and so forth of that is a weight question . . . .[11]

In his motion for new trial, Defendant again objected to the tag number as inadmissible hearsay. At the motion hearing defense counsel contended that the tag number had come into evidence for the truth of the matter asserted—that is, "[the white van] was [Defendant's] car and therefore that was why he was at the scene." The trial court rejected Defendant's argument that the tag number was presented as hearsay:

> [Polson] didn't testify to . . . the license number that the [contractor] wrote down. All she did was testify, I told him to write something down. I watched him write it down. He gave me the piece of paper. I gave the piece of paper to the police officer. The police officer looked up that license number and it led him to Mr. Franklin.

With specific reference to the testimony of Sergeant Williams and Officer Quinn, the trial court again concluded that the tag number was not introduced for its truth:

> They didn't say they got the right tag number from the person. They said I did research on the tag number that was in the file. I got a photo spread based upon the research that I found and I went out and showed a photo spread to the victim and she identified somebody.

---

[11] Stated slightly differently, the trial court later explained, "if [Polson] directed somebody to write something down, she watched them write it down, they immediately hand it to her, she immediately hands it to the police, all of that is subject to cross-examination."

The trial court denied Defendant's motion for new trial on all grounds.[12]

Defendant appealed his conviction. Defendant again argued that the trial court erred in allowing the State to introduce the tag number as hearsay. For the first time, Defendant also argued that the admission of the tag number violated his right to confrontation pursuant to the federal and state constitutions. Defendant specifically contended the contractor's written statement was "testimonial" within the guidelines set forth by the United States Supreme Court in Crawford v. Washington, 541 U.S. 36 (2004). If testimonial, the statement was admitted in violation of Defendant's right of confrontation because Defendant did not have a prior opportunity to cross-examine the contractor. Id. at 68; see Davis v. Washington, 547 U.S. 813, 821 (2006).

The Court of Criminal Appeals determined that the written tag number was hearsay because the trial court admitted the statement to prove what it asserted, that is, the tag number belonged to the white van leaving the parking lot shortly after the Yorkshire Cleaners robbery. In a single sentence, the court concluded that no hearsay exception applied. After analyzing the Supreme Court's reasoning in Crawford and Davis and considering the multi-factor test that we recounted in State v. Lewis, 235 S.W.3d 136, 143 (Tenn. 2007) (citing State v. Maclin, 183 S.W.3d 335, 349 (Tenn. 2006)), the court also held that the contractor's statement was testimonial, such that its admission violated Defendant's confrontation rights. Because Defendant established plain error affecting a substantial right, the court vacated Defendant's conviction and remanded for a new trial.[13]

We granted the State's application for permission to appeal, which raises the lone question of whether the contractor's written identification of the white van's tag number is inadmissible testimonial hearsay.

---

[12] The motion for new trial also challenged the sufficiency of the evidence and the appropriateness of the sentence. These issues were also raised to and rejected by the Court of Criminal Appeals. Neither issue is raised before this Court.

[13] After vacating the conviction based on the violation of Defendant's confrontation rights, the Court of Criminal Appeals went on to analyze and reject Defendant's challenges to the sufficiency of the evidence and his sentencing. Defendant also contended that the cumulative effect of the trial court's errors deprived him of the constitutional rights to due process and a jury trial. The court deemed the cumulative error claim to be unsupported by argument and, therefore, waived. In any event, the court pointed out that the grant of a new trial on confrontation grounds obviated the cumulative error issue.

<u>Standard of Review</u>

Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record. <u>Lewis</u>, 235 S.W.3d at 141. A trial court abuses its discretion only when it applies an incorrect legal standard or makes a ruling that is "'illogical or unreasonable and causes an injustice to the party complaining.'" <u>Id.</u> (quoting <u>State v. Ruiz</u>, 204 S.W.3d 772, 778 (Tenn. 2006)).

Whether the admission of hearsay statements violated a defendant's confrontation rights is, however, a pure question of law. <u>Lilly v. Virginia</u>, 527 U.S. 116, 125 (1999); <u>Lewis</u>, 235 S.W.3d at 141-42. The proper application of that law to the trial court's factual findings is likewise a question of law, subject to de novo review. <u>Lewis</u>, 235 S.W.3d at 142.

## ANALYSIS

The Confrontation Clause of the Sixth Amendment to the United States Constitution directs, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The right of confrontation is fundamental and applies to the states through the Fourteenth Amendment. <u>Pointer v. Texas</u>, 380 U.S. 400, 403 (1965); <u>State v. Cannon</u>, 254 S.W.3d 287, 301 (Tenn. 2008). Furthermore, article I, section 9 of the Tennessee Constitution contains its own confrontation provision: "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." The Tennessee provision is phrased differently from the federal provision. Nonetheless, while "[t]he 'face-to-face' language found in the Tennessee Constitution has been held to impose a higher right than that found in the federal constitution," <u>State v. Deuter</u>, 839 S.W.2d 391, 395 (Tenn. 1992), we have never found evidence excluded under our own state constitution's confrontation clause that was not also excluded under the corresponding provision in the federal constitution, <u>Lewis</u>, 235 S.W.3d at 144. Indeed, despite the differences in phrasing, "'this Court has largely adopted the standards used by the United States Supreme Court . . . in determining whether the Tennessee constitutional right has been violated.'" <u>Id.</u> (quoting <u>Maclin</u>, 183 S.W.3d at 343) (alteration in original).

Within the past decade, the Supreme Court's standards for evaluating Confrontation Clause violations have changed. In <u>Crawford v. Washington</u>, the Supreme Court held that, "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." 541 U.S. at 68. Therefore, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant, any testimonial statement of a witness absent from trial is

-10-

inadmissible. Id. at 59; Corona v. State, 929 So. 2d 588, 594 (Fla. Dist. Ct. App. 2006); State v. Mizenko, 127 P.3d 458, 460-61 (Mont. 2006). By contrast, "[w]here nontestimonial hearsay is at issue," the Crawford decision "afford[s] the States flexibility in their development of hearsay law[.]" 541 U.S. at 68. In other words, as the Supreme Court subsequently explained in Davis v. Washington, nontestimonial hearsay "is not subject to the Confrontation Clause."[14] 547 U.S. at 821. Accordingly, in the courts of this state, the admissibility of a nontestimonial hearsay statement is governed by the Tennessee Rules of Evidence. Lewis, 235 S.W.3d at 145.

### *Whether the Statement Is Hearsay*

Up to this point in our post-Crawford jurisprudence, we have dealt with statements that were undisputed hearsay. The present case is different, however, because the trial court ruled that the written tag number was not hearsay, though the Court of Criminal Appeals disagreed. As Crawford noted parenthetically, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)); see also Davis, 547 U.S. at 824 (confirming that the Confrontation Clause "applied only in the testimonial context" in Supreme Court cases decided "[w]ell into the 20th century"). Accordingly, since Crawford, federal and state courts alike have found no Confrontation Clause violation where the out-of-court statement—whether testimonial or not—was admitted for some purpose other than the truth of the matter asserted. See, e.g., United States v. Warman, 578 F.3d 320, 346 (6th Cir. 2009); United States v. Jiminez, 564 F.3d 1280,

---

[14] Before Crawford established "testimonial hearsay," unavailability, and a prior opportunity to cross-examine as the touchstones of Confrontation Clause analysis, the hearsay statement of an unavailable declarant would be admissible where the statement had "adequate 'indicia of reliability.'" Ohio v. Roberts, 448 U.S. 56, 66 (1980). Those indicia included "fall[ing] within a firmly rooted hearsay exception" or carrying "particularized guarantees of trustworthiness." Id. In the immediate aftermath of Crawford, we continued to apply the Roberts standard in determining the admissibility of nontestimonial hearsay. See Maclin, 183 S.W.3d at 343, 353.

Subsequently, Davis explained that nontestimonial statements were outside the scope of the Confrontation Clause. 547 U.S. at 821. And, in a later case declining to apply Crawford retroactively on collateral review in federal proceedings, the Supreme Court explicitly departed from the Roberts framework in analyzing nontestimonial statements and explained that "[u]nder Crawford, . . . the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability." Whorton v. Bockting, 549 U.S. 406, 420 (2007). Accordingly, at our next opportunity, we held that "when hearsay evidence is nontestimonial and otherwise admissible under our Rules of Evidence, a separate analysis under Roberts is unnecessary under either the federal or state constitutions." Lewis, 235 S.W.3d at 145.

1286-87 (11th Cir. 2009); State v. McGee, 284 S.W.3d 690, 701-02 (Mo. Ct. App. 2009); Del Carmen Hernandez v. State, 273 S.W.3d 685, 688-89 (Tex. Crim. App. 2008).

Therefore, in deciding this case, before we address whether the written tag number is "testimonial," we must first satisfy ourselves that the statement is hearsay and thus potentially eligible for Confrontation Clause protection. See United States v. Mendez, 514 F.3d 1035, 1043 (10th Cir. 2008). This point was contested in the trial court and on the initial appeal. The State persuaded the trial court that the written tag number was not hearsay and argued the same before the Court of Criminal Appeals. The Court of Criminal Appeals rejected the State's argument and held that the trial court violated the rule against hearsay when it allowed the written tag number into evidence. On brief and at oral argument before this Court, the State has reversed its prior position and now concedes that the statement was hearsay. We accept the State's concession. See Barron v. State Dep't of Human Servs., 184 S.W.3d 219, 223 (Tenn. 2006) (stating that court is not bound to accept party's concession and may independently analyze the conceded issue).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A written assertion counts as a "statement." Id. 801(a). In this case, Polson told the contractor standing nearby that she had been robbed and asked the contractor to observe the tag number of the vehicle driven by the man whom she believed had just left the Yorkshire Cleaners. The contractor, who was closer to the vehicle than she was, did so. The contractor then came inside the business and wrote down the tag number for Polson. Accordingly, this written statement asserts that the tag number belonged to the white minivan that the contractor observed leaving the strip mall parking lot.

Sergeant Williams testified that Polson provided a tag number for the vehicle she said belonged to the robber and that he included the tag number in his offense report. Officer Quinn then testified that he saw the tag number in the offense report, researched that number, and discovered that it was registered to a vehicle in Defendant's name. Based on this testimony, we conclude that the State introduced the contractor's written statement for its truth, that is, the tag number belonged to the white minivan in which the man who had robbed the Yorkshire Cleaners left the scene. Since it was made out of court by a declarant not available for cross-examination, it is hearsay.

*Whether the Statement Is Testimonial*

Having determined that the contractor's statement was indeed hearsay, we now turn to the "threshold question" of Confrontation Clause analysis: whether the statement is "testimonial." See United States v. Hinton, 423 F.3d 355, 358 (3d Cir. 2005). The United

States Supreme Court has defined "testimonial" only incrementally, hewing closely to the specific facts of each case and refraining from comprehensive elaboration of what the term means. In Crawford, the Supreme Court extensively traced the history of "the principal evil" targeted by the Confrontation Clause: "the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." 541 U.S. at 50. The Court explained that the Confrontation Clause "applies to 'witnesses' against the accused—in other words those who 'bear testimony.'" Id. at 51 (quoting 2 Noah Webster, An American Dictionary of the English Language (1828)). The Court in turn defined testimony as a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. (quoting Webster, supra). The Court explained that someone making a formal accusation to government officials "bears testimony" in a way that someone casually remarking to an acquaintance does not. Id.

After articulating several possible "formulations" of a testimonial statement, the Court ultimately concluded that the "testimonial" category "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. at 51-52, 68. That minimal definition was sufficient to decide Crawford, where the declarant made the challenged hearsay statements in police custody, responding to detectives' questions while being considered as a possible suspect. Id. at 65. The admission of those testimonial statements violated the petitioner's Sixth Amendment rights because there was no opportunity to cross-examine the declarant. Id. at 68.

In Davis, the Supreme Court was asked to "determine more precisely which police interrogations produce testimony." 547 U.S. at 822. The Court held that, in the context of police interrogation, "[s]tatements are nontestimonial . . . under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id. By contrast, statements made during interrogations are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id.

This "primary purpose" test in Davis was sufficient for the Court to decide the companion cases, both domestic assaults. A 911 caller's identification of the defendant was a nontestimonial statement because it was "plainly a call for help against bona fide physical threat" with a primary purpose "to enable police assistance to meet an ongoing emergency."[15] Id. at 827-28. Unlike the formalized interrogation in Crawford, the declarant in Davis described events as they were unfolding, faced an ongoing emergency, responded to

---

[15] The Court treated the 911 operator as an agent of law enforcement and considered her actions to be those of the police. Davis, 547 U.S. at 823 n.2.

questions designed to resolve the emergency, and provided "frantic answers" in a dangerous setting void of any formality. Id. at 827.

By contrast, in the "much easier" companion case of Hammon v. Indiana, the Court held that the victim gave testimonial responses to police questioning, including a written statement on a battery affidavit, after the disturbance had ended and while her husband-assailant was kept by another officer in a separate room. Id. at 829-30. Instead of "a cry for help []or the provision of information enabling officers immediately to end a threatening situation," an objective perspective established that "the primary . . . purpose of the interrogation was to investigate a possible crime." Id. at 830, 832. The Court specifically distinguished statements "seeking aid" that "showed immediacy" from a "narrative of past events . . . delivered at some remove in time from the danger."[16] Id. at 831-32.

To this point, we have likewise wrestled with the definition of "testimonial" primarily in the context of statements made to law enforcement or its agents. We began with State v. Maclin, a consolidated pair of appeals that we decided after Crawford but before the Supreme Court issued an opinion in Davis. Carefully reading Crawford, we discerned that "testimony involves a formal or official statement made or elicited with a purpose of being introduced at a criminal trial." 183 S.W.3d at 346. While noting that the presence or absence of an oath was not dispositive, we also rejected a per se approach that would have classified every accusatory statement to a police officer during an investigation as "testimonial." Id. at 346, 348. Borrowing language from Crawford, we decided that the "overarching consideration" was "whether the statement was made 'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" Id. at 349 (quoting Crawford, 541 U.S. at 52). We articulated the following list of non-exclusive factors to aid in deciding whether a particular statement is "testimonial":

_____

[16] Since Davis, the United States Supreme Court has addressed the Confrontation Clause in four other decisions, none of which requires a detailed analysis to resolve the case presently before us. In Whorton v. Bockting, the Supreme Court held that Crawford did not apply retroactively to cases already final on direct review when Crawford was decided. 549 U.S. at 409. By contrast, Danforth v. Minnesota held that states retained the discretion to apply new rules of criminal procedure retroactively in their own post-conviction proceedings. 552 U.S. 264, 266 (2008). Giles v. California delineated the scope of the "forfeiture by wrongdoing" exception to the defendant's right of confrontation. — U.S. —, 128 S. Ct. 2678, 2693 (2008). Finally, Melendez-Diaz v. Massachusetts, a "rather straightforward application" of Crawford, held that sworn affidavits (denominated as "certificates of analysis") showing the results of forensic tests performed on cocaine bags seized during the defendant's arrest were testimonial statements, and the defendant was entitled to an opportunity to cross-examine the analysts who authored the affidavits. — U.S. —, 129 S. Ct. 2527, 2532 (2009).

-14-

(1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at a trial.

Id.

Applied to the facts in Maclin, we described as "testimonial" the victim's "detailed narrative of the defendant's assault" in response to police officers' general question whether the victim was okay. Id. at 352. Our analysis emphasized that the victim had initiated contact with police by calling 911, was no longer in immediate danger when police responded, and included "extraordinary detail" in her response. Id. By contrast, in the "much easier" companion case of State v. Anderson, we held that a group of teenage witnesses offered nontestimonial statements when they flagged down a police officer and, upon being asked "What's going on?," pointed to a building sounding a burglar alarm and gave a physical description of the intruder. Id. at 353. We concluded that the witnesses' statements "merely intended to direct police intervention to a crime in progress" without anticipating their statements would be used at trial. Id. Likewise, we concluded that the officer's intent "was not to develop evidence for prosecution or trial, but merely to determine what was happening and what type of police intervention was needed." Id. We emphasized the officer's "preliminary investigational mode" in trying to determine the source and cause of the burglar alarm, the witnesses' informal manner in flagging down the officer, and the general nature of the officer's question to the witnesses. Id.

With the benefit of the Supreme Court's decision in Davis, we returned to the Confrontation Clause in State v. Lewis. In that case, the defendant was convicted for facilitation of the attempted especially aggravated robbery and criminally negligent homicide of the owner of an antiques store. At trial, the proof established that, when employees of the business next door heard noises in the antiques store and went to investigate, the owner cried out for help, asking them to call 911 and explaining that he had been shot. A police officer arrived at the scene and asked the owner questions about what had happened. After paramedics arrived and began treating the owner's wounds, he told the officer that "the lady's information is on the desk." When the officer asked which "lady" the victim meant, the victim replied, "the lady with the vases." When asked whether this lady was connected to the crime, the victim responded, "I know she is." The officer found a paper on the desk

counter with the defendant's name, driver's license number, and the words "two vases." Prior to the crime, the defendant had been in negotiations to sell two vases to the owner. 235 S.W.3d at 139-40.

On appeal, the defendant challenged the admission of the victim's statement "I know she is" as a violation of the Confrontation Clause. Id. at 146. We recited language from Davis regarding the distinctions between testimonial and nontestimonial statements made to law enforcement, id. at 143-44, and regarding the factual distinctions among the contexts surrounding the statements made in Crawford, Davis, and Hammon, id. at 146-47. We held that the statement "I know she is" qualified as testimonial. Id. at 147. Our analysis emphasized that the assailant had left the store, the victim had spoken with the employees from the business next door, and the 911 call had already taken place. Id. Although still at the crime scene, the victim was responding to inquiries by investigating officers. Id. The statement was a summary of past criminal events, rather than a description of an ongoing emergency.[17] Id.

In our most recent decision addressing the definition of "testimonial," we acknowledged that the Supreme Court's decision in Davis "abrogated" our prior decision in Maclin because the Court adopted a "primary purpose test . . . requir[ing] courts to examine the context in which a statement is given." Cannon, 254 S.W.3d at 302. We then held that "[s]tatements are testimonial if the primary purpose of the statement is to establish or to prove past events potentially relevant to later criminal prosecutions." Id. at 303.

In Cannon, we applied the primary purpose test to four sets of statements made by a rape victim. First, we held that statements to emergency room personnel, as memorialized in the victim's medical records, were nontestimonial because (1) Crawford cited business records as an example of nontestimonial statements and (2) the primary purpose of the statements was medical diagnosis and treatment. Id. (citing Crawford, 541 U.S. at 56). Second, statements to the police officer who responded to the victim's 911 call were testimonial because there was no ongoing emergency, and the primary purposes of the victim's statements "were to describe and to establish a past crime" rather than to make a "cry for help." Id. at 304 (internal quotation omitted). Third, the victim's statements to a detective at the emergency room were testimonial because the emergency room personnel had already stabilized the victim, and the primary purpose of both the detective and the victim was the exchange of information about a past crime. Id.

---

[17] Although we classified the statement as testimonial, we nonetheless sustained the trial court's admission of the statement into evidence because it was a dying declaration. Joining every other jurisdiction that had decided the issue, we held that the dying declaration hearsay exception "survives the mandate of Crawford regardless of its testimonial nature." Lewis, 235 S.W.3d at 148.

Fourth and finally, we held that the victim's statements to the sexual assault nurse examiner were testimonial.  Id. at 305.  We considered these statements to raise a question of first impression explicitly unresolved by Davis—"[t]he proper classification of out-of-court statements to persons other than law enforcement personnel"—although we noted that the Supreme Court had treated the 911 operator in Davis as an agent of the police.  Id. at 304.  We concluded that the primary purpose of the nurse's interrogation of the victim was to establish past events relevant to a later prosecution.  Id. at 305.  We emphasized the nurse's testimony concerning her law enforcement training on how to ask questions and collect evidence; her description of the "investigation" and "forensic examination" that she performed on the victim; the detective's participation in the questioning; the delay of the questioning until after emergency room personnel examined the victim; and the policy of both the police department and the hospital to have a sexual assault nurse examiner speak with each victim of a sex-related crime.[18]  Id.

Even more specifically than the statements to the sexual assault nurse examiner in Cannon, the case presently before us raises a question that the Supreme Court has explicitly left undecided: "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'"  Davis, 547 U.S. at 823 n.2.  Unlike Cannon, neither the victim nor the contractor in this case had any association or agency relationship with law enforcement.  Instead, this case presents an exchange between two truly private parties.

Some of the existing law supports the proposition that conversations between private parties are categorically nontestimonial.  In Crawford, while discussing the scope of the Sixth Amendment, the Supreme Court explained that "[a]n off-hand, overheard remark . . . bears little resemblance to the civil-law abuses the Confrontation Clause targeted," in contrast with "ex parte examinations [by government officials] . . . the Framers certainly would not have condoned."  541 U.S. at 51.  Continuing to the definition of "testimony," the Court drew another distinction: "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."  Id.  The Court repeated this distinction in Davis.  547 U.S. at 824.

Other language in Davis also suggests that conversations between private parties cannot be testimonial.  In discussing the history of the Supreme Court's Confrontation Clause jurisprudence, Davis cited a case involving the admissibility of a conversation between fellow prisoners as an example of "statements at issue [that] were clearly nontestimonial."

---

[18] Although the testimonial statements were improperly admitted without an opportunity for the defendant to cross-examine the victim, we did not conduct a harmless-error analysis because we had already held that the defendant was entitled to a new trial on unrelated grounds.  Cannon, 254 S.W.3d at 307.

Id. at 825 (citing Dutton v. Evans, 400 U.S. 74, 87-89 (1970)). Davis also stated unequivocally that "formality is indeed essential to testimonial utterance," id. at 830 n.5, and an exchange between two private parties will often lack the requisite formality when neither party has any association or agency relationship with law enforcement. While Davis cautioned that its analysis of police interrogations was "not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial," id. at 822 n.1, some courts have speculated whether this language only "le[aves] open the question of whether statements made to government officials other than law enforcement are testimonial," rather than holding open the door for classifying any statements to private parties as testimonial, see State v. Brown, 173 P.3d 612, 632 (Kan. 2007).

Based on the language from Crawford and Davis, some courts have categorically held that statements between private parties—or, at least, specific types of such statements—are not testimonial.[19] Today, however, we do not hold that statements between private parties unconnected to law enforcement, such as the exchange between the victim and the contractor in this case, are per se nontestimonial and thus exempt from Confrontation Clause scrutiny. The United States Supreme Court has not expressly decided this issue, and, much like that Court, we will continue to define which statements are "testimonial" only to the extent necessary to resolve the case before us.[20]

---

[19] See People v. R.F., 825 N.E.2d 287, 295 (Ill. App. Ct. 2005) ("Crawford applies only to statements made to governmental officials; Crawford does not apply to statements made to nongovernmental personnel . . . ."); State v. Calhoun, 657 S.E.2d 424, 427 (N.C. Ct. App. 2008) (holding statement to be nontestimonial because it was made to a private citizen); Garcia v. State, 246 S.W.3d 121, 133 (Tex. App. 2007) (holding that statements to friends, co-workers, and divorce counsel were nontestimonial because they did not fall within the "minimum" categories of testimonial statements enumerated in Crawford). Other courts have strongly intimated the existence of such a categorical rule. See, e.g., State v. Feliciano, 901 A.2d 631, 642 (R.I. 2006) (discussing a "casual remark to an acquaintance" and citing cases variously involving friends, co-workers, and co-conspirators); State v. Ladner, 644 S.E.2d 684, 689-90 (S.C. 2007) (collecting cases holding that spontaneous utterances by small children to parents or other close relatives are nontestimonial); cf. Seely v. State, 282 S.W.3d 778, 787 (Ark. 2008) (treating statements made to nonofficials as "presumptively nontestimonial," although the presumption is rebuttable).

[20] As the Supreme Court of Kansas has aptly summarized the state of the law:

In light of the ambiguities and uncertainties of the Crawford and Davis decisions, the unsettled nature of the case law, and the continuing debate between members of the United States Supreme Court and among legal scholars as to the efficacy of the testimonial standard and as to what test formulation best

(continued...)

-18-

Drawing from cases involving police interrogations, the law is clear that statements "'are testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.'" Cannon, 254 S.W.3d at 302 (quoting Davis, 547 U.S. at 822). To account for the absence of law enforcement in this case, we merely need to replace "interrogation" with "dialogue," "exchange," or a similarly neutral term. Conversely, the statement is nontestimonial if the primary purpose is something other than establishing or proving past events potentially relevant to prosecution, such as providing or enabling assistance to resolve an ongoing emergency. See id. An objective standard, focusing on the perspective of a reasonable person, governs the determination of the statement's primary purpose. Davis, 547 U.S. at 822; Seely v. State, 282 S.W.3d 778, 787 (Ark. 2008).

In the context of statements obtained through questions and answers, courts have grappled with the issue of whether the declarant's or the questioner's intent is the proper focus in determining the primary purpose. Some courts have focused exclusively on the declarant's intent.[21] E.g., Cuyuch v. State, 667 S.E.2d 85, 89-90 (Ga. 2008). These courts cite language from Davis stating that "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." 547 U.S. at 822 n.1. Other courts consider both the declarant's and the questioner's intent in determining the primary purpose. E.g., Seely, 282 S.W.3d at 787; Brown, 173 P.3d at 631; State ex rel. Juvenile Dep't v. S.P. (In re S.P.), 215 P.3d 847, 865 (Or. 2009); Commonwealth v. Allshouse, 924 A.2d 1215, 1221 (Pa. Super. Ct. 2007). These courts point to the holding in Davis that statements are testimonial when "the primary purpose of the

---

[20](...continued)
determines when that standard has been met, we will continue to approach the issue broadly under the possibility that the Supreme Court may intend for conversations between a declarant and a nonofficial to be testimonial if other aspects of the test stated in the decisions are met.

Brown, 173 P.3d at 633.

[21] Prior to the Supreme Court's decision in Davis, evaluating the statement from the perspective of a reasonable person in the declarant's position was the prevailing view. See People v. Vigil, 127 P.3d 916, 925 (Colo. 2006) (collecting cases). In the wake of Crawford, courts noted that two of its three suggested formulations for the definition of testimonial statements focused on the declarant's perspective: "pretrial statements that declarants would reasonably expect to be used prosecutorially" and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." See 541 U.S. at 52 (internal quotations from briefs omitted).

interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 547 U.S. at 822. Because different passages in <u>Davis</u> can be read to consider either the declarant's or the questioner's intent, these courts incorporate both perspectives into their objective analysis of the statement's primary purpose. Still other courts have established different tests depending on context. At least one jurisdiction considers the questioner's intent to be paramount when the statements result from police questioning, but the declarant's intent is paramount when law enforcement is not involved in the questioning. <u>E.g.</u>, <u>People v. Stechly</u>, 870 N.E.2d 333, 357, 360 (Ill. 2007). This approach emphasizes that <u>Davis</u> only dealt with responses to police questioning and refrained from discussing other types of statements. <u>Id.</u> at 359. When "supplying information in response to direct police questioning, the declarant is rarely 'in the driver's seat,'" thus warranting a different focus in such cases. <u>Id.</u>

We believe that considering the intent both of a reasonable person in the declarant's position and of a reasonable person in the questioner's position is the approach most faithful to the Supreme Court's decisions in <u>Crawford</u> and <u>Davis</u> and most consistent with our previous applications of those precedents. By making repeated reference to the primary purpose of the interrogation, <u>Davis</u> incorporates the questioner's intent into the determination of whether a statement is testimonial. However, <u>Davis</u> also instructs us to evaluate the declarant's statements, and we cannot ignore the prior language in <u>Crawford</u> regarding the reasonable expectations of the declarant concerning the subsequent use of the statement for prosecution and trial. Given the present state of the law and the limited number of contexts in which the Supreme Court has defined "testimonial" statements, we are reluctant to make an affirmative decision to analyze the question from an entirely different perspective when law enforcement is not involved.

Objectively considering the statement from both the declarant's and questioner's perspectives comports with the way that we have analyzed these questions in prior cases. In <u>Maclin</u>, <u>Lewis</u>, and <u>Cannon</u>, we thoroughly considered all the surrounding circumstances in making case-by-case determinations whether a particular statement was "testimonial." In <u>Maclin</u>, the sixth factor in our non-exclusive list was "the declarant's purpose in making the statements," and the seventh factor was "the officer's[22] purpose in speaking with the declarant." 183 S.W.3d at 349 (footnote added). In determining whether an ongoing emergency existed in <u>Lewis</u>, we noted the victim-declarant's purpose in making the statements—to describe past events—and the officers' purpose in speaking with the victim—to investigate a crime after the perpetrator had left the scene. 235 S.W.3d at 147. We did the same in <u>Cannon</u>, and what makes that case particularly noteworthy is the presence

---

[22] For cases not involving law enforcement, we can readily substitute "officer's" with "questioner's" or a similarly neutral term.

of the sexual assault nurse, who was, at least nominally, someone other than law enforcement personnel. 254 S.W.3d at 304-05. We examined at length the primary purpose of her questioning the victim-declarant. Id. at 305.

We believe the multi-factor test that we first articulated in Maclin and repeated in Lewis remains relevant in determining whether the statement is "testimonial." Such factors as the identity of the declarant, the formality of the surrounding circumstances, the structure and extent of the questioning, et al. may very well bear on the ultimate, decisive inquiry: an objective determination of the primary purpose of the statement. We emphasize that the factors are "non-exhaustive," Lewis, 235 S.W.3d at 143, and allow for consideration of additional factual details specific to a particular case. Lower courts ought not apply the factors mechanically. See United States v. Rankin, 64 M.J. 348, 352 (C.A.A.F. 2007) ("[T]he Crawford analysis is contextual, rather than subject to mathematical application of bright line thresholds."). Instead, courts should consider the factors where helpful in assessing "if the primary purpose of the statement is to establish or to prove past events potentially relevant to later criminal prosecutions," rather than to resolve an ongoing emergency or for some other purpose. Cannon, 254 S.W.3d at 303; see Davis, 547 U.S. at 822.

The Court of Criminal Appeals considered the Lewis factors and concluded that the contractor's statement of the written tag number was testimonial. The court opined that, under the circumstances, an objective witness would have reasonably believed that his statement would be available for use at trial. The contractor was an observer with whom Polson initiated contact to obtain identifying information about the car being driven away by the man whom she believed had robbed the store. The contractor walked over, observed the answer to Polson's question, and then returned and wrote down his response. Ultimately, the intermediate court concluded that the contractor did not make the statement to assist with an emergency because the emergency had already passed. Instead, the court held that the contractor made the written statement "'to establish or prove past events potentially relevant to later criminal prosecution.'" State v. Franklin, No. W2007-02772-CCA-R3-CD, 2009 WL 29893, at *8-9 (Tenn. Crim. App. Jan. 5, 2009) (quoting Davis, 547 U.S. at 822). Accordingly, the court held that the statement was testimonial, and, because Defendant had no opportunity to cross-examine the contractor, its admission violated his Confrontation Clause rights. We disagree.

Based on our review of the facts, we conclude that the contractor's primary purpose for making the statement was to respond to the victim's cry for help and assist with an ongoing emergency. Polson exited the store, got the contractor's attention, and, in quick succession, informed him that she had been robbed and asked him to get the tag number of the vehicle she saw leaving the parking lot. Polson then saw the contractor lean over and

observe the tag number as the minivan drove by. Rather than providing a description of past events that had occurred well beforehand, the contractor's written statement memorialized events that he observed as they were actually happening.[23] Although Polson initiated contact with the contractor, the surrounding context reflects a total absence of the formality and solemnity a reasonable person would associate with the kind of questioning that produces testimonial statements. Polson's "questioning" lacked the bare modicum of structure and was limited in scope to a single issue: the observation of a tag number that the contractor could see but she could not.

Under these circumstances, we conclude that the contractor was simply responding to a plea for help from a distressed individual in need of assistance. An employee from the business next door to his job site claimed that she was robbed and asked him to observe a tag number of a vehicle belonging to a man who was leaving the premises. In the heat of that moment, a reasonable person in the contractor's position would have had very little time to think. He was merely providing requested assistance. The fact that the tag number became relevant to a later prosecution does not automatically make the tag number "testimonial." See Mendez, 514 F.3d at 1046.

Even after the actual crime has ended, the emergency may continue as long as the perpetrator might be found in the vicinity. See United States v. Arnold, 486 F.3d 177, 190 (6th Cir. 2007); People v. Osorio, 81 Cal. Rptr. 3d 167, 176 (Cal. Ct. App. 2008), review denied (Cal. Oct. 28, 2008). In this case, although the robbery had concluded before Polson first spoke to the contractor, we believe that the emergency continued at least until the contractor wrote down the tag number. Polson testified that, based on the threat to "blow [her] ass off" if she did not hand over the business's money, she believed that the perpetrator was armed. Cf. State ex rel. J.A., 949 A.2d 790, 804 n.14 (N.J. 2008) (collecting cases, including Arnold, for the proposition that "after a shooting or an offense involving a gun, the immediate threat of the armed suspect returning to the scene constitutes an ongoing emergency"). Furthermore, after telling her to count to ten, the perpetrator did not leave the store immediately but rather waited until Polson had nearly completed her count. Polson admitted that she "took a chance" by heading out into the parking lot so quickly after she

---

[23] We decline to convert the contractor's summary of events as they were actually happening into a description of past events merely because some negligible amount of time passed between the contractor's personal observation of the tag number in the parking lot and his writing down the number on the sheet of paper inside the cleaners. The outcome of the case does not depend on whether the contractor happened to have pencil and paper on hand as the minivan drove by. Based on Polson's testimony, the primary purpose for which the contractor wrote down the tag number had nothing to do with recording proof for prosecution. Instead, he wrote down the number simply because Polson's hand was shaking so badly that she could not write it herself.

heard the dinging sound at the front door. Therefore, when Polson got the contractor's attention and asked him to write down the tag number while the perpetrator of the robbery was in the parking lot just outside the store, a reasonable person in her position would have thought that the emergency was ongoing and she remained in harm's way. For such a reasonable person preoccupied with obtaining help for an ongoing emergency, the primary purpose of asking for the tag number would not be establishing or proving past events for the benefit of a later criminal prosecution, but to assist in capturing the perpetrator.

Because these federal constitutional principles are frequently litigated in other courts, we consider the decisions of other jurisdictions concerning statements made in comparable factual circumstances. These decisions indicate a growing consensus that statements establishing the identity of the perpetrator are nontestimonial when made in informal settings during the immediate aftermath of a crime.

In State v. Calhoun, a woman arrived home at the same time a police officer pulled up in response to a call regarding shots fired in the vicinity. 657 S.E.2d 424, 425 (N.C. Ct. App. 2008), appeal denied, 666 S.E.2d 651 (N.C. 2008). The woman and the officer entered the home to find the victim on the floor. When the woman asked the victim who had shot him, the victim identified two individuals by their nicknames. Then, when the woman asked the victim to squeeze her hand to confirm that these were the nicknames of the shooters, the victim did so. The officer observed and recorded the identification. Id. While the court held that the statement was nontestimonial because it was made to a private citizen, the court also went on to reason that the statement would have been nontestimonial even if the victim had communicated directly to the officer. Id. at 427. The court emphasized that, in an interrogation with the primary purpose of enabling police assistance to deal with an ongoing emergency, permissible questions may "'establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon.'" Id. (quoting Davis, 547 U.S. at 827). Therefore, identity-establishing responses amidst an ongoing emergency are nontestimonial when the victim responds to a private citizen's request for identification. If such identity-establishing responses are nontestimonial when the victim responds to a private citizen's question, then a similar result should obtain during an ongoing emergency when a private citizen responds to the victim's question.

The context surrounding these identity-establishing responses may provide additional reasons for finding them nontestimonial. In State v. Slater, two men were approached by a victim "walking down the street at a fast pace crying and screaming." 939 A.2d 1105, 1114 (Conn. 2008), cert. denied, 128 S. Ct. 2885 (2008). When the men asked what was wrong and whether they could help, the victim stated that "'a black male with a big knife just raped her.'" Id. The men took the victim inside and called the police. Noting that the absence of law enforcement was not dispositive, the court held that the statements were nontestimonial

because the victim "clearly was seeking aid" and the men responded with "no indication that their primary purpose was to do anything but to aid her." Id. Furthermore, the surrounding circumstances lacked "any degree of formality, solemnity, or reflection." Id. at 1114-15. As compared to our case, Polson was clearly seeking aid when she asked the contractor for the minivan's tag number, and there is no indication that the contractor had any primary purpose besides helping Polson. Where the scene was likewise devoid of formalities, we see no meaningful distinction in the facts that Polson sought help by asking a question and the contractor provided that help by obtaining the information that Polson asked for.

Similar analysis led the Brown court to conclude that, minutes after a shooting, when one witness asked another emotionally distraught bystander what was wrong, the second bystander gave a nontestimonial response by saying, "That's my cousin. They said Lovey shot him." 173 P.3d at 621, 635. The court reasoned that the statement was made from one bystander to another, outside of law enforcement's hearing. Id. at 634. The fact that one bystander "was clearly shaken by the events and the scene" tended to "obviat[e] any implication that [the questioning bystander's] inquiry was to accuse for purposes of criminal prosecution" and "weigh[ed] toward a conclusion that the statement, although accusatory, was not made with that purpose in mind." Id. Again, the court noted the absence of "any of the formalities and procedures otherwise associated with testimonial hearsay." Id. at 635. Here, Polson admitted that she was shaken by the robbery, weighing against the conclusion that her request for the tag number or the contractor's response was intended for the purpose of criminal prosecution.

Indeed, if the questioning is sufficiently informal, such identity-establishing responses have been held nontestimonial even when they are made to law enforcement. In Osorio, a police sergeant arrived on the scene of a burning building to establish traffic control for the fire department. 81 Cal. Rptr. 3d at 175. A firefighter directed the sergeant to a victim in a nearby apartment with a slash injury and apparently in shock. In an exchange that lasted less than two minutes, the sergeant asked the victim what had happened and obtained a description of the victim's assailant, which he broadcast over the police radio. Id. at 175-76. The appellate court held that the trial court properly allowed the individual's responses to "[p]reliminary questions asked at the scene of a crime shortly after it ha[d] occurred" in an "unstructured interaction" that "bore none of the earmarks of a police interrogation." Id. at 176 (internal quotation omitted). In the case before us, we have a response to one preliminary question asked at a crime scene shortly after the crime occurred, in a setting that was even less formal because law enforcement had not yet arrived on the scene. Again, the fact that the victim asked the question does nothing in our mind to change the responsive statement's nontestimonial status.

-24-

Finally, these kinds of identity-establishing statements have been admitted into evidence where the declarant provides them directly to the victim without prompting. In State v. Chavez, the owner of a burglarized car received a note from a witness containing a description of the burglar and the license plate number of the burglar's vehicle. 192 P.3d 1226, 1227 (N.M. Ct. App. 2008), cert. denied, 195 P.3d 1266 (N.M. 2008). The defendant objected that the description of the burglar (though not the license plate number) was testimonial hearsay but was overruled by the trial court. Id. at 1228. Sustaining defendant's conviction, the appellate court reasoned: "[t]he note was intended for the victim, and the use to which it would be put was solely at the victim's discretion. It was not solicited by or given to the police by the declarant, whose only apparent motive was helping the victim ascertain the identity of the thief." Id. at 1229. We have considered a similar analysis in this case, where the contractor wrote down the tag number to help Polson ascertain the identity of the Yorkshire Cleaners robber and gave the number to Polson to use entirely at her discretion. Although Polson solicited the statement and ultimately gave it to the police, the Chavez court based its holding on the facts that the police neither solicited the challenged statement nor received it directly from the declarant—facts which are likewise true in this case.

Having considered the factors in our non-exclusive test, all the surrounding circumstances, and factually similar cases decided by other courts, we hold that the written license tag number of a vehicle leaving the parking lot shortly after the robbery occurred and provided by a civilian bystander to the victim was a nontestimonial statement with the primary purpose of responding to a cry for help during an ongoing emergency. The primary purpose was not to establish or prove past events of potential relevance to subsequent criminal prosecution. Therefore, the statement was nontestimonial hearsay, and its admission into evidence did not violate Defendant's state and federal constitutional rights of confrontation.

*Whether the Statement Is Admissible Under the Tennessee Rules of Evidence*

Because the written tag number did not violate Defendant's confrontation rights, the Tennessee Rules of Evidence govern its admissibility.[24] Lewis, 235 S.W.3d at 145. The

---

[24] Although we review the statement's admissibility under the Rules of Evidence after completing the Confrontation Clause analysis, we emphasize that trial courts are not bound to follow the same sequence when confronted with potentially testimonial statements. Indeed, trial courts understandably may want first to determine whether a hearsay statement falls within one of the applicable exceptions or exclusions. See, e.g., Wright v. State, 916 N.E.2d 269, 275-76 (Ind. Ct. App. 2009); Commonwealth v. Hurley, 913 N.E.2d 850, 860 (Mass. 2009). In particular, if the statement is inadmissible hearsay, then it will not come in under our own Rules of Evidence,

(continued...)

statement is hearsay and thus "not admissible except as provided by these rules or otherwise by law." Tenn. R. Evid. 802. In a single sentence, the Court of Criminal Appeals stated that it had considered the hearsay exceptions set forth in our Rules of Evidence and concluded that none applied to the written tag number.

Before this Court, the State maintains that the statement is admissible under the excited utterance exception to the rule against hearsay.[25] Pursuant to Rule of Evidence 803(2), the hearsay rule does not exclude "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." We have interpreted the rule to set forth three requirements for a statement to meet the excited utterance exception. Cf. Neil P. Cohen et al., Tennessee Law of Evidence § 8.07[3], at 8-75 to 8-77 (5th ed. 2005). The first requirement is "a startling event or condition" that "'suspend[s] the normal, reflective thought processes of the declarant.'" State v. Stout, 46 S.W.3d 689, 699 (Tenn. 2001) (quoting State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997)) (other internal quotations omitted).[26] Second, the statement must "relate to" the startling event or condition. Id. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." Gordon, 952 S.W.2d at 820 (quotation omitted); Cohen et al., § 8.07[3][c], at 8-76. The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." Stout, 46 S.W.3d at 699-700. This requirement considers a variety of factors, including the interval of time between the startling event and the statement.[27] Id. at 700.

---

[24](...continued)
regardless of whether the statement is "testimonial." Structuring the analysis this way has the salutary effect of resolving admissibility on nonconstitutional grounds that make it unnecessary to reach the constitutional question. See State v. Taylor, 70 S.W.3d 717, 720-21 (Tenn. 2002) (discussing presumption against deciding constitutional questions); see generally State ex rel. J.A., 949 A.2d at 806-809 (Rivera-Soto, J., dissenting).

[25] We previously confronted the question of whether alleged "excited utterances" can be classified as testimonial and refused to adopt a per se rule exempting all excited utterances from the category of testimonial hearsay. Maclin, 183 S.W.3d at 351. At the same time, we also rejected an approach that refused to consider the excited nature of the utterance as a factor in determining whether the statement is testimonial. Id.

[26] Stout was abrogated by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004).

[27] Other factors potentially relevant to deciding whether the declarant made a statement under
(continued...)

Underlying the excited utterance exception is the theory that "circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." State v. Land, 34 S.W.3d 516, 528 (Tenn. Crim. App. 2000). We have also recognized that a statement made while the memory is fresh in the declarant's mind may be more accurate than a later description of the event in court. Gordon, 952 S.W.2d at 819-20 (quoting Neil P. Cohen et al., Tennessee Law of Evidence § 803(2).1, at 532 (3d ed. 1995)). We have described the "ultimate test" of whether a statement meets the excited-utterance standard as "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication."[28] State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993).

In this case, we conclude that the recording and delivery of the written tag number meet the requirements of an excited utterance. First, although the "startling event" is typically the act giving rise to the underlying legal controversy—in this case, the Yorkshire Cleaners robbery—"a subsequent startling event or condition which is related to the prior event can [also] produce an excited utterance." Gordon, 952 S.W.2d at 820. To be precise, the startling event for the contractor was not the robbery itself, but instead Polson's sudden departure from the cleaners and announcement to the contractor that she had been robbed by the man who had just left the cleaners. This announcement was manifestly related to the robbery itself. The evidence supports the conclusion that Polson made this announcement while in an excited state. She admitted at trial that she was "a little shaky" when she exited the store, particularly because it was the first time she had been robbed. Sergeant Williams further testified that, even when he arrived on the scene minutes later, Polson was still "very upset and scared." When a person in this condition announces that they have been robbed, that announcement is a "startling event" sufficient to suspend the normal, reflective thought processes of the person who hears it.

---

[27](...continued)
stress or excitement include "'the nature and seriousness of the event or condition; the appearance, behavior, outlook, and circumstances of the declarant, including such characteristics as age and physical or mental condition; and the contents of the statement itself.'" Stout, 46 S.W.3d at 700 (quoting Gordon, 952 S.W.2d at 820).

[28] In addition to the three requirements enumerated supra, the excited utterance exception has a competency requirement: "the declarant must have had an opportunity to observe the facts contained in the extrajudicial statement." Land, 34 S.W.3d at 529; Cohen et al., § 8.07[4], at 8-78. Polson's testimony that the contractor saw the tag number as the minivan drove by satisfies this competency requirement.

Second, the contractor's statement was related to the startling event. Along with announcing that she had been robbed, Polson asked the contractor to observe the tag number of the vehicle that the man leaving the store had gotten into. The contractor recorded the tag number in response to Polson's request.

Third, the contractor observed and recorded the tag number quickly, suggesting that the contractor was still under the stress and excitement of Polson's announcement that she had been robbed. Polson testified that, as she exited the store, the white minivan was already beginning to move. Therefore, the contractor's observation of the tag number took place just a few moments after Polson announced that she had been robbed. The contractor was standing two to three feet away from the vehicle as it passed by. Since it was moving away, he had little time to reflect before acting. Polson testified that the contractor then came back inside the store, where he found Polson shaking too severely to write down the tag number herself. Given the quick succession of events, the seriousness of robbery, and the contractor's close proximity to the minivan when observing the tag number, the totality of the circumstances indicates that the contractor observed and recorded the tag number in a manner that "preclude[s] the idea of deliberation and fabrication." Smith, 857 S.W.2d at 9. The written tag number that the contractor provided in response to Polson's question meets the requirements for admission as an excited utterance.[29] See id. (explaining that excited utterances should not be excluded simply because they were elicited in response to a question asked by another).

*Remaining Issues*

Our resolution of the single issue presented to us reinstates Defendant's conviction. Typically, this would result in a remand to the Court of Criminal Appeals to consider any issues pretermitted by its original ruling. In this case, however, the Court of Criminal Appeals also considered and rejected all of Defendant's other challenges concerning the sufficiency of the evidence, his sentence, and cumulative error. Although Defendant does not raise these issues before this Court, we have exercised our discretion to address them for the sake of thoroughness. See Tenn. R. App. P. 13(b). For the reasons explained below, we agree with the Court of Criminal Appeals' resolution of these issues.

First, Defendant challenges the sufficiency of the evidence to establish his identity as the robber. The proper inquiry is, after considering the evidence in a light most favorable to

---

[29] Because we conclude that the statement is nontestimonial hearsay admissible as an excited utterance, we need not reach Defendant's argument that the State failed to prove that the contractor was unavailable to testify at trial, and we offer no opinion on the merits of that argument. See Cannon, 254 S.W.3d at 306.

the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Evans, 108 S.W.3d 231, 236 (Tenn. 2003). We give the State the strongest legitimate view of the evidence introduced at trial and all reasonable and legitimate inferences which may be drawn from that evidence. Evans, 108 S.W.3d at 237; State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). Because the verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, Defendant bears the burden on appeal of showing why the evidence is insufficient to support the jury's verdict. Evans, 108 S.W.3d at 237; Carruthers, 35 S.W.3d at 557-58. In this case, Defendant has not carried his burden. The victim identified Defendant in a photo lineup two days after the robbery and then identified Defendant again at trial. Dugger and Smith likewise identified Defendant in photo lineups that placed him at the strip mall shortly before the robbery took place. A bystander observed and recorded the tag number of a vehicle registered to Defendant leaving the strip mall shortly after the robbery took place. Based on this evidence we are persuaded that a rational trier of fact could have found beyond a reasonable doubt that Defendant committed the robbery.

We likewise reject Defendant's challenge to the length of his sentence and the denial of community corrections. On appeal the party challenging the sentence imposed by the trial court has the burden of proving it is erroneous. Tenn. Code Ann. § 40-35-401, sentencing comm'n cmts. (2006); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). When the length, range, or manner of sentence is challenged, the appellate court conducts de novo review with a presumption of correctness, conditioned on the affirmative showing that the trial court considered proper sentencing principles and all relevant facts and circumstances. Tenn. Code Ann. § 40-35-401(d); State v. Carter, 254 S.W.3d 335, 344-345 (Tenn. 2008). If we find that the trial court erred in considering any sentencing principles or facts, then we review the sentence de novo without the presumption of correctness. Carter, 254 S.W.3d at 345.

In conducting de novo review, we must consider provisions contained in Tennessee Code Annotated section 40-35-210(b) (2006). The 2005 amendments to our Sentencing Act eliminated mandatory weighing of mitigating and enhancement factors, rendering them purely advisory. See Tenn. Code Ann. § 40-35-210(c); Carter, 254 S.W.3d at 344. However, sentencing courts still must "consider" each guideline that is relevant but may weigh each guideline in their own discretion. Id.

Robbery is a Class C felony. Tenn. Code Ann. § 39-13-401. As a Range III offender, Defendant was eligible for a sentence of ten to fifteen years. Id. § 40-35-112(c)(3) (2006). Here, the trial court found the existence of two enhancement factors: previous history of criminal convictions in addition to those necessary to establish Range III status, and

Defendant's failure to comply with conditions involving release into the community. See id. § 40-35-114(1), (8) (2006).

The record supports both of the trial court's findings. For a Class C felon such as Defendant to qualify as a Range III persistent offender, he must have received at least five prior felony convictions within the same, higher, or next two lower felony classes. Id. § 40-35-107(a)(1) (2006). Here, within Defendant's twenty-year-long criminal history, the State cited nine felonies in its "Notice of Enhancement and Impeachment," all documented in the presentence report: four convictions for driving while a habitual motor vehicle offender, three convictions for possession of a controlled substance with intent to sell, and one conviction apiece for solicitation of a felony and petty larceny. Therefore, beyond the five prior felony convictions that establish Defendant as a Range III offender, he has a history of additional criminal offenses that the trial court properly considered as an enhancement factor. Furthermore, the presentence report documented a violation of probation in 1987 that establishes Defendant's failure to comply with conditions of a sentence involving release into the community.[30] Although Defendant asserts that such a judicial finding violated his right to a jury trial under Blakely v. Washington, 542 U.S. 296 (2004), Defendant admits this issue is merely being preserved for future review, as we have already held that Blakely does not implicate our Sentencing Act following the 2005 amendments, see State v. Banks, 271 S.W.3d 90, 144-45 (Tenn. 2008). In short, the trial court properly exercised its discretion in sentencing Defendant to a twelve-year term.

Defendant next argues that the sentence should have been into community corrections, rather than the Department of Corrections. By likewise rendering advisory the guidelines for alternative sentencing, the 2005 amendments eliminate the presumption that a Class C felon is a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6) (2006); Carter, 254 S.W.3d at 347. Additionally, Defendant fails to meet the eligibility criteria of Tennessee Code Annotated section 40-36-106(a) (2006) because he was convicted of a crime against Polson's person. See State v. Weaver, No. W2006-00786-CCA-R3-CD, 2007 WL 1215061, at *3 (Tenn. Crim. App. Apr. 25, 2007). Defendant has a long history of criminal conduct, including the nine felonies previously discussed, and an alternative sentence would depreciate the seriousness of Defendant's offense. See Tenn. Code Ann. § 40-35-103(1)(A)-(B) (2006). No special need for alternative sentencing has been shown. Cf. id. § 40-36-106(c). Therefore, we affirm the trial court's decision to sentence Defendant to the Department of Corrections.

---

[30] Because the probation violation had taken place twenty years before the sentencing hearing for the robbery conviction in this case, the trial court stated on the record and in its findings of fact that it would not assign weight to Defendant's failure to comply with conditions of release into the community.

In the absence of any reversible error in the issues that Defendant raised before the Court of Criminal Appeals, we likewise reject Defendant's argument that the trial court's errors cumulatively deprived him of the constitutional rights to due process and a jury trial.

<u>Conclusion</u>

Based on an objective review of the surrounding circumstances, we conclude that the primary purpose of the written tag number was to provide assistance during an ongoing emergency, rather than to establish or prove past events of potential relevance to subsequent criminal prosecution. We also hold that the written tag number satisfied the requirements of the excited utterance exception to the rule against the admission of hearsay testimony. Therefore, the trial court, while failing to recognize the statement as hearsay, properly allowed it into evidence. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate Defendant's conviction for robbery and sentence of twelve years. Since it appears Defendant is indigent, we tax the costs of this appeal to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE