# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. WILLIAM RANDALL CRAWFORD

**Direct Appeal from the Circuit Court for Grainger County**
**No. 4563      O. Duane Slone, Judge**

---

**No. E2009-02544-CCA-R3-CD - Filed July 7, 2011**

---

The defendant, William Randall Crawford, pled guilty to three counts of attempted first degree murder, two counts of aggravated assault, and one count of simple assault. He received an aggregate sentence of forty-six years in the Tennessee Department of Correction. On appeal, he challenges the sentencing determinations made by the trial court, specifically arguing that he should have received the minimum sentence for each individual offense and that the sentences should not have been ordered to run consecutively. After careful review, we conclude that the trial court imposed a lawful sentence and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J. and ALAN E. GLENN, J., joined.

Edward C. Miller, District Public Defender, for the appellant, William Randall Crawford.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; James B. (Jimmy) Dunn, District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

On October 26, 2009, at the guilty plea acceptance hearing, the trial court advised the defendant on the record that he was pleading "open" to all counts. The court explained to the defendant that no recommendation of an appropriate sentence had been agreed to and that the range of punishment the defendant faced was a minimum of fifteen years to a maximum of eighty-eight years. The defendant indicated that he understood.

Next, the trial court asked the prosecutor to outline the facts the State would attempt to prove had this case gone to trial. The State then gave a recitation, which included the following facts. The prosecutor revealed that Emmley Crawford and the defendant had been married for sixteen and a half years and had two children together. On April 24, 2008, Ms. Crawford filed for divorce and obtained an order of protection against the defendant. On Saturday April 26, 2008, the defendant, armed with a rifle and other weapons, fired shots through a glass door and windows of his mother-in-law's and stepfather-in-law's residence, where Ms. Crawford and the children were staying. The defendant then entered the home and immediately shot Mrs. Loretta Dalton, his mother-in-law, in the head, and she fell to the floor. The defendant continued shooting and shot Jeff Dalton, his stepfather-in-law, twice in the head. Mr. Dalton also fell to the floor and was temporarily blinded. Next, the defendant laid the rifle on a table and began to chase his wife. She, along with her daughter, ran upstairs to escape the defendant. The defendant soon caught his wife, knocked her down, got on top of her, beat her, and tried to stab her. The defendant's son got an unloaded shotgun from the closet and pointed it at the defendant. The defendant took the unloaded gun away from his son and stabbed his son in the left side with a hunting knife. He then continued to beat his wife. At this time, the defendant's daughter got on his back, put her arms around his neck, and tried to pull him off her mother. The defendant bit his daughter on the arm, threw her off his back, and proceeded down the stairs. Before leaving the residence, the defendant walked over to Mrs. Loretta Dalton and kicked her. She lay still on the floor. Next, he kicked Mr. Dalton, who moved. The defendant took out his knife and stabbed Mr. Dalton at least five times, leaving him with his intestines protruding from his body. The defendant then left the house and was not seen again until early the following Wednesday morning when he was found behind the house where he had apparently hidden for three or four days. The defendant acknowledged that these were the facts the State would expect to prove against him should this case have gone to trial. The trial court then accepted the defendant's guilty pleas and set a sentencing hearing for December 7, 2009.

During the sentencing hearing, the trial court accepted several exhibits which were considered in addition to the testimony offered at the hearing. A presentence report was introduced, which indicated that the defendant had no prior criminal convictions on his record. Also introduced was a certified copy of the order of protection, which was in effect at the time the defendant committed the instant crimes. The State also introduced the multiple victim impact statements filed in the case by the victims of the defendant's attack. Letters written by the defendant to his wife and children were also introduced. The defendant also introduced personnel information from his employer and a psychological evaluation conducted by Dr. Diana McCoy. The evaluation concluded that the defendant had acted "recklessly" in committing these acts based, in part, on his fear of losing his family after his wife left him. The report also indicated that the defendant was singled out for

mistreatment by his stepmother as a child, that he was sexually abused by two male relatives, and that his I.Q. placed him in the low-average range of intelligence.

Mrs. Emmley Crawford testified that she had been married to the defendant for sixteen and one-half years and that they had two children together. She testified that the defendant had repeatedly abused her both physically and verbally during the course of their marriage. She further testified that the defendant was extremely jealous, prevented her from going places alone, and told her that he would kill her if she ever left him. She recalled one specific occasion when she was seven months pregnant with her son and the defendant hit her in the ribs above her stomach, causing her to fall backward into the bathtub. Because of her injuries, she was forced to go to the hospital to seek treatment, although she did not tell the authorities what had actually caused them. She indicated that she had attempted to leave the defendant on three prior occasions, but she had remained with him when he threatened to keep the children from her.

In addition, Mrs. Crawford indicated that the defendant was abusive to the children as well. She testified regarding an incident in which she witnessed the defendant assault their son in October of 2007, when they were building a carport onto their house. She stated that the defendant tackled their son and began punching him. After she pulled the defendant off of their son, she took their son to the doctor where he was diagnosed with a broken scapula. She also gave testimony concerning an assault committed by the defendant against his aunt during which he punched her in the eye.

With regard to the specific incident which led to her finally leaving the defendant, Mrs. Crawford testified that on March 23, 2008, Easter Sunday, after she and the children returned home from church, she and the defendant argued. The argument became physical, and the defendant threw a jewelry box, which hit Mrs. Crawford in the head. Mrs. Crawford testified that the following morning after the defendant left for work, she and the children moved out of the home. She related that she subsequently filed for divorce and obtained an order of protection against the defendant.

Mrs. Crawford testified that she eventually began staying with her mother and stepfather after the separation. Their residence was next to the home where she and the defendant had lived. Mrs. Crawford gave detailed testimony about the defendant's actions when he shot his way into the home. She stated that, following the incident, her stepfather was hospitalized for fourteen days and was comatose for eleven of those days. Her son was hospitalized for four days as a result of his stab wound. Her mother was hospitalized for four days and underwent two surgeries. Mrs. Crawford testified that she never feels safe and that she cannot leave her blinds open when it gets dark. She stated that neither of the children

wanted to see the defendant because they were afraid of him. She further testified that the incident had affected their daughter, who was always afraid and suffered from anxiety.

On cross-examination, Mrs. Crawford acknowledged the defendant's contribution to the family by maintaining employment and providing for her and the children.

The defendant's seventeen-year-old son also testified and stated that he had seen his mother being assaulted by his father on many occasions. He said he unsuccessfully tried to stop it by stepping in. He testified that his father often called him, his sister, and his mother vile names and that he lived in fear his father would beat him or hit him and his mom. The son recalled his father tackling him and punching him in the head, shoulders, and stomach. He testified that, on one occasion, he had to be taken to the hospital, where he was diagnosed with a broken shoulder blade. He testified that he once saw his dad pull a gun on his mother and tell her, "[I]f you don't shut up, I'll shoot you. I'll kill you." He testified that, when this abuse would happen, he would run into the woods and hide.

He also testified that, during this shooting, he saw his father on top of his mother and that the defendant stabbed him under his heart with a knife when he tried to help his mother. He said he received a three-inch cut that extended all the way down to his rib cage. He testified that the knife punctured his lung and that he still feels like there is pressure behind his rib cage and feels pain whenever he runs. He said that he can no longer play football due to his injuries.

On cross-examination, the son acknowledged that he never confided in anyone that he was being assaulted by his father, stating that he had been instructed not to by the defendant. When asked whether his shoulder injury was related to football, he answered that he was never injured playing football, although he did acknowledge that he had stopped playing prior to the defendant's attack.

The next witness to testify was the defendant's mother-in-law, Loretta Dalton. She testified that on the night this incident occurred, she was sitting on the couch when she heard something that sounded like fireworks. She was then struck in the head by a bullet. She later said that, while she was "playing dead," the defendant kicked her.

Mrs. Dalton also testified that she had seen signs of physical abuse against her daughter during her marriage to the defendant. She indicated that she had seen bruises on her daughter and knots the size of a fist on the back of her daughter's head. She testified regarding one event that occurred when the defendant nailed the doors to the house shut from the outside. She testified that on that day, she helped her daughter through a back window,

took her to get something to eat, brought her back home, and then closed the window so the defendant would never know anyone had left.

Mrs. Dalton also testified to an incident during which the defendant had pushed her to the ground and was about to hit her. She stated that the defendant's aunt intervened and stopped the defendant. She indicated that she had not pressed charges over the incident because the defendant had threatened to kill both her and his wife.

The next witness to testify was the defendant's stepfather-in-law, Jeff Dalton. He had known the defendant for eleven years and had never had any cross words or problems with the defendant until the night of this incident. He testified that the defendant's son, when he was approximately eleven or twelve years of age, would ask him, "[W]hy don't you kill my daddy?" but he never knew why he would say that because his wife, his step-daughter, and the children kept the abuse from him.

On the night of the shooting, Mr. Dalton was on the couch when he was shot. He heard the defendant shouting and heard him tell Emmley, "I told you what I would do if you ever left me." Mr. Dalton testified that he was also stabbed in the side and around the front. As a result, he had two surgeries and was in a coma for eleven days. He testified that before his injuries, he did all types of work, operated a landscape nursery, and did tree trimming; however, he is now unable to work. He testified that he remains fearful in his own home that the defendant will come after him again.

The State rested, and the defendant called Missy Ortega, his sister, as the first witness. Mrs. Ortega indicated that she had moved near the defendant and his family in 2007 and that she saw the family on a daily basis. She stated that she never witnessed any abuse in the household. In fact, she described the family situation in a positive light, recalling instances when her brother took his son fishing and when the family watched movies, went to the mall, or attended church together. She also stated that it was Mrs. Crawford who made all the household decisions and handled the family's finances.

Mrs. Ortega also testified that she was present in the house on Easter Sunday when the incident occurred with the jewelry box. She stated that she heard the jewelry box hit the stairs and saw Mrs. Crawford holding her head and crying, but she did not actually see the defendant throw the box.

Ms. Ortega said that, after the separation, her brother was very depressed and cried a lot, sometimes all night. She said that he wanted to know why his wife had left and kept saying that he just wanted his family back. She testified that the defendant rarely ate and that he told her he was fasting and praying so he could get his family back. She said that he

began spending a lot of time on the Internet and became involved with prayer lines. She said that during this time, her brother could be described as very distraught. She recalled at least two suicide attempts during the parties' separation; he took pills both times. She related that even though her brother was distraught, was not eating, and was crying all the time, he was still able to go to work and that he would carry his pocket Bible into the bathroom and frequently read his Bible.

The next witness called by the defense was David Ortega, the defendant's brother-in-law. He described how he, his wife, and their children spent a lot of time in the Crawford home and never saw any signs of abuse. He indicated that it appeared to him that Mrs. Crawford was the leader in the household and that the defendant's main goal was to provide his family with a "good living." He stated that the defendant virtually fell apart, physically and mentally, after the separation. Mr. Ortega acknowledged that the defendant did not approve of his wife spending time at her mother's house. He also testified that he had never seen the defendant behave violently and was not afraid of the defendant. On cross-examination, Mr. Ortega admitted that he had separated from Mrs. Ortega in November of 2007, and, for half a year, he had no contact with the Crawfords until the shooting took place.

The next witness called by the defense was Detective Jesse Jarnigan of the Grainger County Sheriff's Department, who testified that he knew of no disciplinary problems caused by the defendant while he had been in custody. The defendant also made a statement in which he apologized to his family. He said that his "emotions just got out of hand," that he "couldn't handle it," and that he would just like to say he was sorry.

After hearing all the evidence presented, the trial court sentenced the defendant as follows: (1) twenty-three years for the attempted first degree murder of Emmley Crawford; (2) eighteen years for the attempted first degree murder of Jeffery Dalton; (3) eighteen years for the attempted first degree murder of Loretta Dalton; (4) five years for the aggravated domestic assault of Austin Crawford; (5) three years for the aggravated domestic assault of Candiace Crawford; and (6) eleven months and twenty-nine days for the domestic assault of Candiace Crawford. The court further ordered partial consecutive sentencing based upon finding the defendant to be a dangerous offender and imposed an effective sentence of forty-six years. The defendant now appeals.

**ANALYSIS**

In this timely filed appeal, the defendant contests the sentencing determinations made by the trial court. First, he asserts that the court erred in failing to impose the minimum sentence within the range for each individual sentence. Further, he argues that the court erred in its imposition of consecutive sentencing.

-6-

**I. Sentence Length**

The defendant first contends that the trial court erred in imposing what he terms "excessive" sentences for each of the individual convictions. In a rather unclear argument, he states that the trial court "never directly considered any of the enumerated enhancement factors," "[did not] consider the statutory mitigating factors," and "did not balance [the mitigating factors found" versus the aggravating factors. He contends that "the trial court erred by imposing the various sentences on [the defendant] because said sentences are excessive under the sentencing considerations . . . and inconsistent with the purposes of sentencing. . . ." He further maintains that the court was precluded from imposing any sentence above the minimum sentence in this case, based upon *Blakely v. Washington*, 542 U.S. 296 (2004).

When a defendant challenges a sentence, he or she bears the burden of demonstrating that the sentence is improper. T.C.A. § 40-35-401 (2010); *see also State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). Challenges made to length, range, or manner of service of a sentence are reviewed by appellate courts using a *de novo* review with a presumption of correctness. T.C.A. § 40-35-401(d); *see also State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010). This presumption of correctness, however, is conditioned upon an affirmative showing that the trial court applied and considered the relevant facts and circumstances and adhered to the proper sentencing principles. *Franklin*, 308 S.W.3d at 825; *Carter*, 254 S.W.3d at 344-45. When a trial court fails to meet these requirements, review is *de novo* with no presumption of correctness. *Franklin*, 308 S.W.3d at 825; *Carter*, 254 S.W.3d at 345.

As noted, the defendant has asserted a constitutional argument based upon the United States Supreme Court's decision in *Blakely*. The defendant is correct in his assertion that it is a violation of a defendant's Sixth Amendment right to a jury trial to allow a trial judge to enhance a minimum presumptive sentence utilizing facts other than those reflected in the jury's verdict or admitted by the defendant. *Blakely*, 542 U.S. at 305. However, the argument ignores the plethora of cases that followed the *Blakely* decision.

As is now well established, our legislature amended our sentencing scheme in 2005, following the *Blakely* holding, to avoid possible constitutional violations arising from a trial court increasing a presumptive sentence on the basis of judicially-determined enhancement factors. The amended statute no longer imposes a presumptive minimum sentence and allows a trial court to select any sentence within the applicable range so long as the length of the sentence is consistent with the purposes and principles of the Sentencing Act. *Carter*, 254 S.W.3d at 343. The United States Supreme Court in *Cunningham v. California*, 549 U.S. 270, 294 (2007), acknowledged the statute's constitutionality noting that several states,

including Tennessee, had chosen to modify their sentencing systems "to permit judges genuinely 'to exercise broad discretion . . . within a statutory range,' which 'everyone agrees,' encounters no Sixth Amendment shoal." The defendant acknowledges the United States Supreme Court's approval of our state sentencing scheme in the *Cunningham* case, but he still maintains that error occurred here. However, we can afford the defendant no relief on this ground. Under the current law, the defendant's Sixth Amendment right to a jury trial was not violated.

Next, we turn to the defendant's argument that his sentences are excessive under the sentencing considerations and inconsistent with the purposes of sentencing. He further asserts specific error in the trial court's alleged failure to enunciate specific enhancement and mitigating factors applied, as well a failure to properly balance those factors in determining the appropriate sentence. As previously noted, following the 2005 amendments, the trial court has been given much greater discretion in imposing sentence length and is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act.]" *Carter*, 254 S.W.3d at 243. "Those purposes and principles include 'the imposition of a sentence justly deserved in relation to the seriousness of the offense,' a punishment sufficient 'to prevent crime and promote respect for the law,' and consideration of a defendant's 'potential or lack of potential for . . . rehabilitation.'" *Id.* (internal citations omitted). Additionally, the amendments also rendered the application of the statutorily enumerated enhancement and mitigating factors as merely advisory and not binding on the court. *Id.* Nonetheless, trial courts must still "place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." T.C.A. § 40-35-210(e) (2011).

Because of the great discretion given to the trial court in determining sentence length pursuant to these amendments, appellate courts are left with a much narrower set of circumstances in which they may find that a trial court has abused its discretion in determining the length of a sentence. *Carter*, 254 S.W.3d at 345. An appellate court is bound by a trial court's decision with regard to sentence length as long as it is imposed in a manner consistent with the purposes and principles of sections -102 and -103 of the Sentencing Act. *Id.* at 346.

In imposing the sentences in this case, the trial court made multiple findings of fact on the record:

> The Court has considered the principles set forth in the criminal sentencing act, the information and evidence contained in the Presentence Investigation Report, the arguments of counsel, and the evidence introduced during this

Sentencing Hearing and then stipulated to during the defendant's pleas of guilty.

In regard to the attempted first degree murder with regard to Mrs. Emmley Crawford, the Court does find in this particular case there was a [fifteen]-year history of criminal behavior that ran throughout pretty much the entire length of their marriage; that this victim was – it is almost a textbook case of domestic violence patterns that the Court is familiar with; and that she didn't make any reports to the sheriff's department or perhaps even to family members, as probably enhances her version of that – their history, as much as anything.

And it's corroborated by her son who testified he frequently attempted to intervene to protect his mother. She was attacked – I assume before the horrific events that led to these convictions and had been struck by a jewelry box. The evidence potentially being corroborated by her sister-in-law, the defendant's witness.

This defendant was served with an Order of Protection to restrain him from coming about this victim, and he violated that Order of Protection.

In regard to the [victim's] injury she did sustain an injury to her knee that did cause her an extreme amount of pain.

The court puts its greatest weight in the [fifteen]-year history of domestic violence and terror that this lady had to endure.

The Court does consider in mitigating factors this defendant's family history of being subjected to very reckless parents. And the physical and the sexual abuse that he endured and, no doubt, caused him – to coupled with – the Court does consider – his I.Q. of 82 that's uncontested in the record as –

And in looking at especially the conclusions and opinions of Dr. McCoy that, undoubtedly – in consideration of the stress that he was under and the fear and loss of his family – tended to motivate him to act as recklessly as he did on this occasion.

The Court – first considering the enhancing factors and then the mitigating factors in this to go to this particular count – the Court does find the appropriate sentence to be [twenty-three] years.

With regard to the conviction for Mrs. Dalton – or the attempted first degree murder of Mrs. Dalton – the Court finds no enhancing factors to apply. The Court does sentence this defendant [to] [fifteen] years with regard to that conviction.

With regard to the attempted first degree murder conviction with regard to Mr. Dalton, the Court does find that the injuries to particularly great; that he was – even though he was in a coma for [eleven] days; but moreover than that – his second aggravated assault, essentially, was committed and that his bowels were – he was sliced open and his bowels were laid out. So, the Court puts its greatest weight in the extreme injuries suffered by Mr. Dalton and enhances that sentence to [eighteen] years.

The Court, however, goes back to the sentence with regard to Mrs. Dalton. The Court neglected – the Court does find that she was kicked while she was on the ground after being shot in the head. The Court does find that she was treated with exceptional cruelty. With regard to that kick, the Court does enhance that sentence to [eighteen] years; and after taking into consideration the previously side [sic] of mitigating factors, those same mitigating factors apply to the sentence imposed with regard to the conviction for the attempted first degree murder on Mr. Dalton.

With regard to the aggravated assault convictions, the Court finds that the criminal behavior that was in the household during this young man Austin's entire life are perfect to be considered in that case, that this young man had been actually criminally assaulted by his father, at least on one prior occasion, when he broke I think it was his collarbone. I know it was a bone in the shoulder area or collarbone.

But this family obviously suffered greatly because of the terror [inflicted] by this man as their father and husband.

The same mitigating factors apply. However, the Court finds the appropriate sentence in that case to be five years.

With regard to the aggravated assault with regard to Miss Candiace Crawford, the Court does find that she was in the same household, subject to the same – apparently the same threats of violence, however, the Court doesn't have any particular concrete evidence with regard to what she witnessed, in the record.

And considering the mitigating factors in this case, the Court does find the appropriate sentence to be three years with regard to that conviction.

In the simple assault conviction, the Court does find that with regard to Miss Candiace Crawford, that the appropriate sentence in that matter to be [eleven] months and [twenty-nine] days.

Initially, we conclude that the Defendant is incorrect in his assertion that the trial court failed to consider the statutory enhancing and mitigating factors. While the trial court may not have specifically referred, by citation, to each of the factors, our reading of the court's oral findings makes clear exactly what the court considered with regard to its determination of each sentence. With regard to the sentences involving the defendant's crimes against his wife and son, it is readily apparent that the trial court considered enhancement factor (1), prior criminal conduct based upon the defendant's domestic abuse of his family, which was adequately established by the victims' testimony at the sentencing hearing. The record also indicates that the court applied enhancement factor (6), that the injuries inflicted were particularly great, with regard to the conviction for the attempted murder of his wife. However, the court gave this factor little weight. Further, the record establishes that the court applied only enhancement factor (6), that the injuries inflicted were particularly great, with regard to the sentence imposed for his acts against Mr. Dalton. Again, the record supports the court's findings as Mr. Dalton was shot twice in the head and left lying on the floor with his intestines protruding from his body. He then remained in a coma for eleven days. Although not argued by the defendant, the record further makes clear that the trial court applied the single enhancement factor of treating the victim with exceptional cruelty to the conviction for Mrs. Dalton. Again, the fact that the defendant kicked Mrs. Dalton on the ground after having shot her in head supports the court's determination that this factor was appropriate.

We also glean from the record exactly what evidence the trial court considered in mitigation in setting the sentence length. The court referenced and gave weight to the fact that the defendant had an unstable childhood, suffered from sexual abuse, and has a lower I.Q. The court also considered the opinions of the evaluating psychologist who concluded that the defendant was motivated to act recklessly in committing these acts by his fear of losing his family. That the court failed to enumerate a statutory provision or to find other mitigation is not an abuse of discretion on the record before us. Moreover, the law is abundantly clear that the trial court's weighing of enhancement versus mitigating factors is not an issue which this court may even consider.

Thus, after review of the trial court's extensive findings, we must conclude that no abuse of discretion occurred in this case. The trial court considered all applicable criteria set

forth in the Sentencing Act, imposed a sentence within the applicable range, set forth its reasons for imposing the instant sentences, and the relevant findings are adequately supported by the record. The defendant has failed to carry his burden of establishing an improper sentence.

## II. Consecutive Sentencing

The defendant next takes issue with the trial court's decision to impose partial consecutive sentencing based upon the finding that the defendant was a dangerous offender. The defendant contends that he is "not the type of dangerous offender that needs consecutive sentencing to protect the public" because "[t]his incident was isolated and brought about by the unique circumstances and was not the act of a 'one-man crime wave' to which the legislature intended the 'dangerous offender' label to apply." We disagree.

As relevant here, a court may order sentences to run consecutively if the court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b) (2010); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). Furthermore, in the event that the trial court finds the defendant is a "dangerous offender," it must also determine what has generally become referred to as the "*Wilkerson* factors," that is whether the consecutive sentences: (1) are reasonably related to the severity of the offenses committed; (2) serve to protect the public from further criminal conduct by the offender; and (3) are congruent with the general principles of sentencing. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

In ordering partial consecutive sentencing in this case, the trial court made the following oral findings on the record:

> However, with regard to the question of consecutive – concurrent sentencing, the Court does find that this defendant is an extremely dangerous offender [in] part because of the violent past that he demonstrated in over [fifteen] years in terrorizing his family, that this was a moment that was probably was – that it could be inevitable.
>
> And certainly this defendant – in the Court's view – is a danger to others when he's released. The Court is concerned that he could – that this particular man sitting in front of the Court today – could do further injury to his former wife and even children.

He is a dangerous man in every sense of the word, in the Court's opinion; and we're very lucky that we don't have, at least, [three] murders instead of the attempted first degree murders.

I agree with Mr. Dalton that they are extremely fortunate that they all – that they're here, and that you didn't have their murders to haunt you the rest of your life.

At least, they're still alive, Mr. Crawford; however, the Court does find that, in this particular case, that the consecutive sentencing is certainly appropriate. The severity of these offenses – if this record doesn't speak for it – I don't know what does, the way that you subjected your family members to this terror on this night in front of your very own children; shooting their grandparents and kicking them in front of your wife. Her father's intestines being laid open in front of her after shooting. The Order of Protection being in place, it – if there's ever an incident - certainly a case where, in this Court's view, where there's a [reign] of violence by somebody who doesn't have a particular criminal history as far as convictions go – and if this isn't a case, I don't know what is.

After review of the record, we conclude that the trial court's finding that the defendant is a dangerous offender who exhibits little regard for human life and has no hesitation about committing a crime in which the risk to human life is high is amply supported by the record. Also, we conclude that the trial court found the existence of the "*Wilkerson* factors" in this case. The trial court commented upon the severity of the criminal acts, and the Defendant's danger to others when released. The trial court implicitly noted that consecutive sentencing as imposed in this case is congruent with the general principles of sentencing. In addition, the trial court imposed partial concurrent sentencing. The record established that this defendant shot his way into a home occupied by five people, including his own two children, and proceeded to create havoc within. Victims were shot, stabbed, and beaten before the defendant finally left the scene. This evidence, combined with the testimony given with regard to the fifteen years of abuse which occurred prior to this incident, amply supports the court's findings. No abuse of discretion occurred.

The defendant's arguments that this was a "one-time" occurrence is wholly misplaced. It ignores the fact that he abused his own wife and children for a period of years. Both his wife and son were forced to seek medical treatment caused by the defendant's abuse. Moreover, the proof further established that the defendant attacked his own aunt, punching her in the face. That these people did not report the crimes or that the defendant appeared to limit his abuse to his own family members does not make the defendant any less

-13-

dangerous. That the defendant now relies upon his lack of criminal convictions to argue that he is not a dangerous man is without merit in light of the evidence presented by his family members at the hearing.

## CONCLUSION

Based upon the foregoing, the sentences imposed by the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE