# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs March 29, 2011

## STATE OF TENNESSEE v. DAVID A. TAYLOR

**Appeal from the Circuit Court for Sevier County**
**No. 14334-II     Richard R. Vance, Judge**

---

**No. E2010-01123-CCA-R3-CD - Filed July 18, 2011**

---

A Sevier County Circuit Court jury convicted the defendant, David A. Taylor, of aggravated rape of a child, *see* T.C.A. § 39-13-531(a) (2006), and the trial court imposed a sentence of 60 years' incarceration to be served at 100 percent by operation of law, *see id.* § 40-35-501(i)(2)(L). In this appeal, the defendant challenges the trial court's denial of the motion to suppress his pretrial statement to police, the admission of hearsay statements of the victim, the sufficiency of the convicting evidence, and the sentence imposed by the trial court. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

Steve McEwen, Knoxville, Tennessee (on appeal); and Michaela Burnham, Assistant District Public Defender (at trial), for the appellant, David A. Taylor.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; James B. Dunn, District Attorney General; and George Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The conviction in this case relates to the defendant's digitally penetrating his two-year-old niece, L.D., in February 2009.[1] At trial, Christine Tate, the victim's paternal grandmother and legal guardian, testified that at the time of the offense, she had legal custody

---

[1] As is the policy of this court, we will refer to the minor victim only by her initials.

of the victim, who was born August 17, 2006, and had been her legal custodian since 2007. On February 24, 2009, Ms. Tate took L.D. to spend time with the child's maternal grandmother, Charlotte Taylor, and picked her up on February 26, 2009. Ms. Tate said that she and Ms. Taylor had an agreement that L.D. should not be left in the care of any other individual during Ms. Taylor's visitation with her. Ms. Tate said that when she went to pick up the victim, the victim's mother, Debra Davis, came out of the residence and told her "nothing happened, ordinary day. [L.D.] stayed with Mom. She didn't go anywhere with nobody." A few moments later, Ms. Taylor came out of the residence and said the same thing. Ms. Tate said that the women's behavior was very unusual. Ms. Tate said that the defendant then came onto the porch and that the defendant's presence surprised her because the defendant was not supposed to have contact with the victim.

Ms. Tate testified that her general practice was to give the victim a bath immediately after picking her up from Ms. Taylor's and that the victim generally loved taking baths. On that day, however, the victim refused to take a bath, and Ms. Tate acquiesced, choosing instead just to wash the victim off. Later that evening, the victim told Ms. Tate, "Nana, it just hurts, it hurts when I pee." Ms. Tate said she gave the victim cranberry juice and plenty of water thinking that she had developed a urinary tract infection. Ms. Tate said that the victim's "private area" appeared "scalded or chapped, like really red or raw." She testified that she initially believed the victim may have been given "too much cola" or that she had been left too long in a wet diaper. Ms. Tate said that she continued to give the victim cranberry juice and attempted to contact her pediatrician to no avail. Ms. Tate testified that the victim continued to cry and complain of pain all night long. On the following afternoon, Ms. Tate insisted that the victim take a bath and told the victim to urinate before getting into the bathtub. Ms. Tate described what happened next:

> She started screaming. I mean, she was crying. Tears were just rolling down her face crying, no Nana, no. Don't wash my goose. Don't touch my goose, Nana. She said, ow. She said he lost his ring in it and he put a hole in my goose. And I went, what? She said, he couldn't find his ring, Nana, so he stuck his finger up my butt. I said, what do you mean? She said, Uncle Al. She said, he put his ring up in my goose and then he put his finger in and couldn't find it so then he put his finger up my butt.

Ms. Tate explained that the victim referred to her vagina as her "goose" and to the defendant as "Uncle Al."

Ms. Tate said that the victim "acted like she was scared to death, afraid to tell"

Ms. Tate what had happened. She testified that she asked the victim when this had happened, and the victim replied, "[W]hen I spent the night at Mamaw Charlotte's." Ms. Tate said that she was "in shock" but nevertheless tried to get the victim to let her examine the area. Ms. Tate said that the victim continued to cry in pain and reiterated, "[H]e had a ring on his finger. He stuck his finger in my goose. He lost his ring. . . . [H]e told me he was a doctor, he could get it." Ms. Tate took the victim into another room and examined her more closely. She said the victim's vaginal area "was all blood red from the front halfway to the back . . . like she was scalded and almost blistered." Given the victim's allegation, the condition of the area, and her continuing pain, Ms. Tate took the victim to the emergency room. Ms. Tate testified that the victim was discharged from the hospital later that same day.

Doctor Steve Dronen, the emergency room physician who examined the victim on February 28, 2009, testified that the "only significant finding was that in examining her genital area, the inner labia, what we call the labia minor, were red and inflamed." He said that the victim had "no evidence of urine infection" or "any kind of foreign body or discharge coming from the vagina." He also said that there was no evidence that the victim was suffering from a yeast infection. He said the victim's complaints along with his physical findings were consistent with digital penetration of the vagina.

Gail Clift, a pediatric nurse practitioner who examined the victim in conjunction with the allegations on April 20, 2009, testified that she found that the victim "had a rash on her buttocks" and "some mild redness" but no abnormal findings. Ms. Clift said that her examination would neither confirm nor rebut the victim's claim of digital penetration.

Sevierville Police Department Detective Kevin Bush testified that he was working as the weekend "on call" detective when he responded to the victim's report of sexual abuse. He went to the Sevierville Medical Center and interviewed Ms. Tate. Following this interview, he developed the defendant as the primary suspect and eventually located the defendant approximately one month after the report of abuse and made contact with the defendant by telephone. The defendant agreed to participate in an interview, but he told the officer that he did not have transportation to the police department. Detective Bush and Detective Sam Hinson traveled to the defendant's residence, and the defendant agreed to ride with them to the police department for the interview. Detective Bush said that the defendant did not appear to be under the influence of drugs or alcohol. Once at the police station, Detectives Bush and Hinson interviewed the defendant inside Detective Hinson's office. Prior to the interview, the detectives provided the defendant with *Miranda* warnings, and the defendant signed a written waiver form acknowledging that he had been advised of his rights and had elected to waive them. Detective Bush said that the defendant confessed digitally penetrating the victim and "wanted to really get it across that it was just his fingers.

[The defendant] felt it was important for [them] to know that it wasn't his penis but that it was just his fingers." He said the defendant attempted to blame the offenses on his use of and addiction to [o]xy[c]ontin." Detective Bush testified that the defendant said it was "a relief to get it off his chest." After the defendant made his statement, Detectives Bush and Hinson allowed him to leave.

During cross-examination, Detective Bush acknowledged that he discussed with the defendant the defendant's "drug dependency problem," specifically his use of oxycontin. He said that the defendant told them that "he hadn't been on them for three or four days."

The defendant's statement provided:

> About a month ago I was at home with my mom, my sister, and [L.D.]. [L.D.] is my three year old niece. My mom and sister gave [L.D.] a bath. [L.D.] came running into the living room with just a towel on. She was wet and I started drying her off. I was messed up on oxycontins that day. I don't remember how many I had done. I usually do a 40 or 80 milligram oxycontin a day. While I was drying her off I put my finger in her vagina. I did it for about 15 seconds. [L.D.] had the towel wrapped around her waist and my hand was under the towel. I don't know why I did it. I feel bad about it and I'm sorry. I stopped touching her when my mom came into the living room. I told [L.D.] not to tell anybody about it.

Sevierville Police Department Detective Sam Hinson confirmed that the defendant voluntarily accompanied the officers to the police station and provided a statement admitting that he digitally penetrated the victim. Detective Hinson said that the defendant did not appear to be under the influence of alcohol or drugs when he made his statement.

At the conclusion of Detective Hinson's testimony, the State rested, and the defense called the defendant's mother, Charlotte Taylor, as a witness. Ms. Taylor testified that the defendant was never alone with the victim during the victim's February 2009 visit in Ms. Taylor's home.

Debra Davis, the defendant's sister and the victim's mother, testified that the victim was never alone with the defendant during the February 2009 visitation. Ms. Davis acknowledged, however, that both she and the defendant consumed drugs during the victim's visit.

Based upon this proof, the jury convicted the defendant of aggravated rape of a child and imposed a $25,000 fine. Following a sentencing hearing, the trial court imposed a sentence of 60 years' incarceration and approved the fine set by the jury. The defendant filed a timely but unsuccessful motion for new trial followed by a timely notice of appeal.

In this appeal, the defendant challenges the trial court's denial of his motion to suppress his pretrial statement to police, the trial court's admission of the victim's hearsay statement implicating the defendant, the sufficiency of the convicting evidence, and the propriety of the sentence. We consider each of the claims in turn.

*I. Motion to Suppress*

The defendant contends that the trial court should have suppressed his statement to Detectives Bush and Hinson because his voluntary intoxication rendered the statement involuntary. The State asserts that the trial court did not err by refusing to suppress the statement.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). We review the issue in the present appeal with these standards in mind.

We also review the issue presented with these well-settled general principles in mind. A confession must be free and voluntary, and it must neither be extracted by any sort of threats or violence nor obtained by any direct or implied promises, nor by the exertion of any improper influence or police overreaching. *Bram v. United States*, 168 U.S. 532, 542-43 (1897). The issue of voluntariness requires the trial judge to focus on whether the accused's will to resist making a confession was overborne. *See State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980). When considering the voluntariness of a confession, this court must examine the totality of the circumstances surrounding the confession to determine whether the circumstances were "'such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Kelly*, 603 S.W.2d at 728 (quoting and adopting the standard set forth in *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). That being said, a statement will be excluded "only if an examination of the totality of the circumstances reveals that the statement was not voluntarily given." *State v. Huddleston*, 924 S.W.2d 666,

670 (Tenn. 1996).

At the hearing on the defendant's motion to suppress, Detective Bush testified essentially as he did at trial. After he located and made contact with the defendant by telephone, Detective Bush offered to transport the defendant, who had agreed to participate in an interview but claimed he had no mode of transportation, to the police department. The defendant agreed, and Detectives Bush and Hinson picked the defendant up from Ms. Taylor's residence and drove him to the police department. Detective Bush, who had five years' experience as an undercover agent for the Fourth Judicial District Drug Task Force, confirmed that the defendant did not appear to be under the influence of alcohol or drugs when the officers picked him up or during any portion of the interview. Prior to the interview, the detectives provided the defendant with *Miranda* warnings, and the defendant signed a written waiver form acknowledging that he had been advised of his rights and had elected to waive them. According to the detective, "after several questions" the defendant "basically confirmed that he did abuse" the victim. Detective Bush testified that although they did not create an audio recording of the initial interview with the defendant, they crafted a hand written statement that the defendant proofread and signed. After the defendant signed the written statement, the detectives "recorded that as [they] read it just to double-check." Detective Bush said that the defendant did not at any time indicate that the written statement prepared by Detective Bush was inaccurate or incorrect. After taking the defendant's statement, Detectives Bush and Hinson allowed him to leave.

During cross-examination, Detective Bush acknowledged that he discussed with the defendant the defendant's "drug dependency problem," specifically his use of oxycontin. He said that the defendant told them that "he hadn't been on them for three or four days" and that "he was trying to wing it."

The defendant denied making any of the admissions contained in the hand written statement prepared by Detective Bush. He claimed that he told the officers that he "might have scraped [the victim] with the tag on the towel" when she came out of the bathroom wrapped in a towel. He said that "[n]ot a word" in the written statement was his. The defendant said that he did not recall the detectives' reading the statement to him and claimed that on the day he provided the statement he had taken 60 or 70 milligrams of methadone.

During cross-examination, the defendant agreed that he went to the police station voluntarily and that he was eager to provide his account of the allegations against him. The defendant recalled agreeing to allow Detective Bush to pick him up at his residence, but he claimed that he could not recall being provided *Miranda* warnings or signing a waiver of the same. The defendant said that he took pain killers on a regular basis

-6-

prior to his incarceration but that he did not take methadone on a regular basis and had taken it only two or three times before taking it on the day of his statement. After listening to the audio recording of a portion of his interview with Detectives Bush and Hinson, the defendant claimed that the voice on the recording was not his.

Ms. Davis testified that she saw the defendant consume half of a 130-milligram bottle of methadone approximately 20 minutes before Detectives Bush and Hinson arrived to take him to the police department. During cross-examination, Ms. Davis admitted that she consumed the remaining half bottle of methadone. She said that she did not read the bottle, but her mother told her that the bottle contained 130 milligrams of methadone. Ms. Davis said that she could not see any outward signs that her brother was intoxicated when he left with the detectives. She claimed, however, that when he returned from the police department he was "under the influence" and appeared "scatter-brained." Ms. Davis admitted that she, too, was under the influence of methadone when the defendant related the circumstances of the interview.

On the basis of this proof, the trial court concluded that the defendant had presented "no evidence" that his statement was coerced or pressured. The court opined that the defendant "voluntarily came to the police department," that he "gave a statement after being fully advised of his *Miranda* rights, that it was voluntarily made," and that he was not intoxicated during the interview. The court specifically accredited the testimony of Detective Bush and deemed the defendant's testimony "without merit." Consequently, the court ruled "that the statement was freely [and] voluntarily made" and denied the defendant's motion to suppress.

In our view, the record supports the ruling of the trial court. The accredited testimony of Detective Bush established that the defendant voluntarily accompanied Detectives Bush and Hinson to the police department, where he gave a voluntary admission that he had digitally penetrated the victim. Although the defendant argues that his testimony at the suppression hearing "demonstrated that he is a drug addict and had ingested methadone" shortly before his interview, the trial court, as the sole arbiter of witness credibility, concluded that the defendant's testimony was completely "without merit." Consequently, the trial court did not err by denying the defendant's motion to suppress.

*II. Victim's Hearsay Statement*

The defendant asserts that the trial court erred by admitting into evidence the victim's statement to Ms. Tate inculpating the defendant because, he claims, the statement does not qualify for admission under any exception to the rule barring hearsay. The State contends that the statement was admissible as an excited utterance.

Prior to trial, the State filed a motion in limine seeking the trial court's ruling that the statement would be admissible at trial. The defendant opposed the motion in general but did not file a response to the State's motion. At the pretrial hearing, the trial court, after hearing the arguments of the parties, made a preliminary ruling that the evidence was admissible as an excited utterance but indicated a willingness to revisit the issue at the trial and in light of any case law either side could present. On the first day of trial, the defense indicated that it did not have any further law or argument to present. At trial, Ms. Tate testified that the victim, while "screaming" and crying in pain, related that the defendant had put his finger in her "goose." It is this testimony that the defendant challenges as inadmissible hearsay.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id*. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). Although the application of the various exceptions to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Id.* Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo.[2] *Gilley*, 297 S.W.3d at 760-61.

In this case, the State sought admission of the victim's statement via the excited utterance exception to the hearsay rule, embodied at Tennessee Rule of Evidence 803(2), which provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(2). Three requirements must be met before a statement qualifies for admission pursuant to this hearsay exception:

> The first requirement is "a startling event or condition" that
> "'suspend[s] the normal, reflective thought processes of the

[2]This is much the same standard applied to the review of a trial court's decision on a motion to suppress. In those cases, the factual determinations of the trial court are conclusive unless the evidence preponderates against them while the application of the law to those factual findings is reviewed de novo. *See Odom*, 928 S.W.2d at 23.

declarant.'" Second, the statement must "relate to" the startling event or condition. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (citations omitted). Our supreme court has stated that the "'ultimate test'" of admissibility via the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Id.* (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

In this case, the trial court concluded that the victim's statement to Ms. Tate implicating the defendant met the requirements for admission because the victim made it while still experiencing physical pain caused by the defendant's digitally penetrating her.

The record supports the ruling of the trial court. The victim's statement to her grandmother came about as a spontaneous reaction to her physical pain and the fear of the pain she might experience in the bath. The statement clearly relates to a startling event, the defendant's placing his finger in the victim's vagina, because it explains the genesis of the pain in her genital area. Despite the temporal distance between the event and the statement, the continued pain caused by the offense clearly placed the victim under stress at the time she made her revelation. Moreover, the victim's age militates against any finding of fabrication and supports a finding of spontaneity. Accordingly, based upon a de novo application of the law to the factual findings of the trial court, we conclude that the trial court did not err by admitting the victim's hearsay statement.

### III. Sufficiency

The defendant also claims that the evidence was insufficient to support his convictions because the medical proof was inconclusive and the victim did not testify. We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137

S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"Aggravated rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is three (3) years of age or less." T.C.A. § 39-13-531(a) (2006).

Here, Ms. Tate testified that two-year-old L.D., while screaming in pain, told her that the defendant had put his finger in her "goose," the victim's term for her vagina. Ms. Tate said that the victim's genital area appeared "blood red from the front halfway to the back . . . like she was scalded and almost blistered." Doctor Dronen confirmed that the victim's "genital area, the inner labia, what we call the labia minor, were red and inflamed" with no evidence of a urinary tract or yeast infection. The defendant confessed to Detectives Bush and Hinson that he digitally penetrated the victim's vagina while toweling her off after a bath. Although Ms. Taylor and Ms. Davis testified that the victim was never left alone with the defendant, the jury, as was its prerogative, rejected this testimony. In addition, the jury, properly instructed on voluntary intoxication, rejected any claim that the defendant was too intoxicated to be held responsible for raping the victim. Under these circumstances, the evidence adduced at trial amply supports the defendant's conviction of aggravated rape of a child.

*IV. Sentencing*

The defendant claims that the trial court erred by sentencing him to 60 year's incarceration, claiming that the court should not have utilized his prior criminal record to enhance his sentence to the maximum within the range. The State asserts that the sentence is appropriate.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial

court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration and proper weight to the factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

Code section 39-13-531 provides that "[a]ggravated rape of a child is a Class A felony and shall be sentenced within Range III, as set forth in title 40, chapter 35." *Id.* § 39-13-531(b). A Range III sentence for a Class A felony is "not less than forty (40) nor more than sixty (60) years." *Id.* § 40-35-112(c)(1).

Here, the trial court, in imposing the maximum Range III sentence of 60 years, concluded that the defendant's extensive criminal record warranted a sentence at the top of the range. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal

-11-

convictions or criminal behavior, in addition to those necessary to establish the appropriate range."). On appeal, the defendant argues that although his record of criminal activity is extensive, he does not have more convictions than that necessary to establish the appropriate range. *See id.* We disagree. Because the only conviction necessary to warrant a Range III sentence in this case was the defendant's conviction of aggravated rape of a child, all of the defendant's 19 prior convictions could be used to enhance the defendant's sentence within Range III.

The record establishes that the trial court considered all relevant sentencing principles and appropriately applied a single enhancement factor related to the defendant's extensive criminal history. Although the defendant complains that the use of his convictions to enhance the sentence within Range III is "patently unjust," he has cited no authority for his claim, and we can find no authority barring the use of prior criminal history under these circumstances. Moreover, we remind the defendant that when the trial court has complied with the requirements of the Sentencing Act, this court is not at liberty to disturb the sentencing decision of the trial court. *See Fletcher*, 805 S.W.2d at 789. The defendant's lengthy criminal record supports the upward adjustment of his sentence to the maximum, Range III sentence of 60 years.

*Conclusion*

Because we find no error in the rulings of the trial court and no deficiency in the proof adduced at trial, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE