# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 08, 2014

## STATE OF TENNESSEE v. MICHAEL JARROD BRADY

**Appeal from the Circuit Court for Madison County**
**No. 13-225     Roy B. Morgan, Jr., Judge**

---

**No. W2013-02784-CCA-R3-CD  - Filed July 29, 2014**

---

A jury convicted the defendant, Michael Jarrod Brady, of aggravated robbery, a Class B felony. The defendant's sole issue on appeal is a challenge to the sufficiency of the evidence. Because we find that the evidence is sufficient to sustain the verdict, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant District Public Defender, for the appellant, Michael Jarrod Brady.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; James G. Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The defendant was convicted of the aggravated robbery of his longtime neighbor,

Octavious Fowler. The victim testified regarding the robbery committed by the defendant and an accomplice.[1] The defendant presented two alibi witnesses in an attempt to establish the impossibility of his involvement in the crime.

The victim had been employed by the city for fifteen years, working at a community center which the defendant frequented. The defendant had lived next door to the victim for eight years, and the victim testified he was thirty-one and had known the defendant over half his life. When the victim got off work at around 1:00 p.m. on September 27, 2012, the defendant and another man were standing outside and asked him for a ride.

The defendant sat in the passenger's seat, and the other man, whom the victim recognized from the community center, sat in the back. While the victim was driving home, the defendant pointed a chrome, nickel-plated gun with a design on it at him and said, "You already know what this is." At first, the victim thought the defendant was joking because he knew he'd be able to identify the defendant, but the defendant said, "This ain't no game." The defendant directed him to drive to an abandoned house on a dead-end street.

The men forced the victim out of the car, and there was a scuffle. They took him near a ditch in the back of the house. The victim testified that he begged for his life, reminding the defendant that he had children, had a baby on the way, and was best friends with the defendant's brother, but the defendant showed no remorse. At some point behind the house, the defendant hit him with the gun above his eye. The victim was stripped of his clothes, and the defendant and his accomplice forced him to the ground as they went through his pockets, taking his car keys, his cell phone, and his wallet, including $600. The victim asked the defendant, "Are you really gonna do this?" The defendant responded by telling him to "shut up." The defendant then put the gun to the center of his head and "pulled the trigger back." The victim testified that at this point he closed his eyes. He believed that the perpetrators next heard someone coming; they went to the corner of the house, telling the victim not to move. The victim's pants and boxer shorts were around his ankles, and he pulled them up, jumped over a barbed wire fence, and ran through the woods until he reached a house where the residents summoned the police. He left his pink work shirt, socks, and shoes behind, and injured his foot on the fence.

Law enforcement responded to the 9-1-1 call at around 1:30 p.m. and photographed the victim's injuries, including scratches and cuts on his arms and face and a puncture wound on the sole of his foot. The victim told Officer James Singleton that $500 had been taken. An officer who went to investigate the abandoned property collected and photographed clothing matching the description of clothing given to him by the victim, including a white

---

[1]The accomplice was not tried together with the defendant.

T-shirt, pink shirt, socks, and boots.

The defense sought to impeach the victim by reference to his statement made at the scene and to his prior testimony. The victim acknowledged that his statement reflected he had known the defendant only two to three years; that he had seen the defendant at the community center between 12:30 and 12:45; that he had described the gun only as a chrome semi-automatic; that he did not mention the scuffle; that he had stated he was stripped to his underwear; that the statement described the defendant pulling the gun out at a different street than his testimony; and that he had said he was hit with the gun before they got to the back of the house rather than after as he had testified. The victim generally reaffirmed his testimony, including the description of the gun and the scuffle. He stated that the location at which the gun was first pulled and at which he was hit with the gun might have been misrecorded in the statement, which was taken under the stress of the incident. The defense also impeached the victim with prior testimony, including testimony that he had known the defendant eight or nine years; testimony that he did not know the accomplice's name but that his name was Marcus; and testimony regarding the streets he drove down. The victim explained that he thought the accomplice's name was Marcus but he did not know for certain and that he had not known the street names at the time of his prior testimony. The defense also brought out the discrepancy in the amount taken with the wallet, which the victim testified was $600 and which an officer testified was reported as $500.

The defendant was apprehended walking on Old Hickory Boulevard towards his home with a cup from a fast food restaurant. The defendant did not have a gun or the victim's money or cell phone. Investigator Antonio Rhodes testified that the defendant was sweating profusely, although the fast food restaurant was only fifty yards away and it was a cool day in the lower 70s. He agreed that the defendant was a large person, at six feet, two inches and two-hundred-forty-five pounds, and he acknowledged that he did not visit the restaurant to find out how long the defendant had been there.

The victim recovered his cell phone from the yard of a house off Old Hickory Boulevard when the residents answered the ringing phone. The victim's wife, who owned the car the victim had been driving, recovered her vehicle when she found it in the parking lot of a Kroger, unlocked and with the keys inside. Police found latent fingerprints, none of which were a match for the defendant's fingerprints. The officer who processed the vehicle testified that he did not seek to recover any surveillance video which could have shown who had left the car.

The defendant's aunt and mother testified as alibi witnesses for him. The defendant resided with his aunt, Diannitta Jones, and she testified that on September 27, 2012, she had gotten off work at 7:00 a.m., had driven to the home of her sister, the defendant's mother,

to take her to work; she then spent the rest of the day at home. The defendant was home at 12:30 p.m., when she began watching a cooking show on TV, and he left a little after 1:00 p.m., when the show had concluded. The defendant's aunt testified that the defendant was on foot and that she would have heard if a car had come to pick up the defendant. The community center was a 45-minute to one-hour walk away. The defendant's aunt has a land line which is hooked up to a phone attached to the wall with a cord. She acknowledged that the defendant goes to the community center every day and that he has two friends named Marcus.

The defendant's mother, Edna Brady, testified that her sister did not pick her up to take her to work that morning. She testified, however, that the defendant called her from her sister's land line at 12:53 p.m. that day, and that she spoke with him for approximately twelve minutes. The defendant's mother's phone records, showing a call from the land line at that time, were introduced into evidence. On cross examination, she testified that it was possible her sister took her to work. She acknowledged that the defendant and victim had known each other for fifteen years and would be able to identify each other and that the defendant had several friends named Marcus.

The jury found the defendant guilty of aggravated robbery as charged in the one-count indictment. The trial court sentenced the defendant to ten years' imprisonment. The defendant appeals, challenging the sufficiency of the evidence.

**ANALYSIS**

Tennessee Rule of Appellate Procedure 13(e) requires a finding of guilt to be set aside if the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. When a court evaluates the sufficiency of the evidence, it must determine whether after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). This court neither reweighs nor reevaluates the evidence, nor may it substitute its inferences for those drawn by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A verdict of guilt replaces the presumption of innocence with one of guilt, and the defendant bears the burden of showing that the evidence was insufficient to support the verdict. *State v. Franklin*, 308 S.W.3d 799, 825 (Tenn. 2010).

The defendant was convicted of aggravated robbery, which, as charged here, is the intentional or knowing theft of property from the person of another by violence or putting the person in fear when that robbery is accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. T.C.A. § 39-13-401, -402(a)(1) (2010).

The defendant challenges the sufficiency of the evidence on three bases: that the victim's testimony was inconsistent and insufficiently corroborated; that police did not adequately investigate potentially exonerating evidence; and that the alibi proof established the defendant could not have committed the crime. Both the reconciliation of discrepancies in the victim's testimony and the determination of the legitimacy of the alibi evidence are credibility determinations which fall to the province of the jury. *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013). "In the resolution of questions of fact, such as those presented by evidence of alibi or the identity of the perpetrator, 'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *Id.* (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)). Furthermore, the testimony of a victim is sufficient to sustain a conviction without corroboration, although in this case, the victim's testimony was also corroborated by the physical evidence. *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000). Finally, "[i]t is not the duty of this Court to pass judgment regarding the investigative techniques used by law enforcement unless they violate specific statutory or constitutional mandates." *State v. Best*, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at *13 (Tenn. Crim. App. Sept. 25, 2008) (quoting *State v. Johnson*, No. M2000-01647-CCA-R3-CD, 2001 WL 1180524, at *17 (Tenn. Crim. App. Oct. 8, 2001)) (holding that the State may nevertheless have a duty to preserve physical evidence). "Due process[2] does not require the police to conduct a particular type of investigation. Rather, the reliability of the evidence gathered by the police is tested in the crucible of a trial at which the defendant receives due process." *Id.* (quoting *State v. Smith*, No. 01 C01-9609-CC-00404, 1998 WL 918607, at * 14 (Tenn. Crim. App. Dec. 31, 1998)).

The victim testified that the defendant, with whom he was well acquainted, held him at gunpoint, forced him to a secluded location, hit him with the gun, and stripped and robbed him of property before he was able to escape. Police found injuries on the victim consistent with having been involved in a struggle, including scratches and a puncture wound on his bare foot sustained from jumping a barbed wire fence. The police further found his missing clothing at the location he had described. The victim's cell phone was recovered from a yard off Old Hickory Boulevard, relatively close to the defendant's home. The defendant was taken into custody on that same street, sweating profusely after an apparently short walk in

---

[2]The defendant does not raise a due process challenge to the investigation.

-5-

cool temperatures. While the defendant's aunt and mother testified that he was at home around the time the crime was committed, the jury did not have to credit their testimony; it could well have chosen to believe that their testimony was interested or mistaken rather than that the victim had staged an elaborate crime scene and implicated an innocent person. Accordingly, the evidence was sufficient to sustain the verdict.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE